Timothy M. Bechtold
Bechtold Law Firm, PLLC
317 East Spruce Street
P.O. Box 7051
Missoula, MT 59807-7051
406-721-1435
406-830-3085 (fax)
tim@bechtoldlaw.net

Attorneys for Estate of Glowdena B. Finnigan

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | | |
|---|---|---|
| **ESTATE OF GLOWDENA B. FINNIGAN,** | ) | **CV 18-109-M-DLC-JCL** |
| | ) | |
| Plaintiff, | ) | **PLAINTIFF'S STATEMENT OF** |
| | ) | **UNDISPUTED FACTS** |
| vs. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Defendant | ) | |

## LIST OF EXHIBITS

1.    Finnigan property patent

2.    Map of the region

3.    Washington Water Power Agreement with Northern Pacific Railway Co.

(July 26, 1955)

4.    Northern Pacific Railway Co. Resolution approving abandonment and relocation (Dec. 13, 1955)

5.    Washington Water Power Agreement letter to Northern Pacific Railway Co. (Oct. 24, 1957)

6.    F.L. Weiss letter to Northern Pacific Railway Co. (Oct. 31, 1957)

7.    Senate Report of National Trails System Improvements Act of 1988, S. Rep. No. 100-408

8.    *Bennett v. United States* complaint

9.    Declaration of Claude I. Burlingame (Jan. 17, 2019).

10.    *Bennett* disclaimer of interest

11.    *Bennett* judgment and decree

12.    *Olson v. Sanders County* complaint

13.    *Olson* decree

14.    *Noxon Rural Fire District* complaint

15.    *Noxon Rural Fire District* stipulation

16.    *Noxon Rural Fire District* judgment and decree

17.    Northern Pacific Railway Co. attempted conveyance to Sanders County

18.    Sanders County commissioners meeting minutes accepting deed from Northern Pacific Railway Co (Feb. 8, 1961).

19.    Sanders County commissioner letter to Washington Water Power (Dec. 11, 1975)

20.   *Finnigan v. Burlington Northern* complaint

21.   *Finnigan v. Burlington Northern* disclaimer of interest

22.   Finnigan quitclaim deed (Nov. 1, 1996)

23.   Finnigan quitclaim deed (Nov. 12, 1996)

24.   *Finnigan v. Burlington Northern* judgment

25.   Carmon Groff declaration (Jan. 18, 2019)

Plaintiff believes the following facts are undisputed:

1.      The Estate of Glowdena B. Finnigan now holds title to Govt. Lots 7 and 8, Sec. 14, T24N, R33W, P.M.M. in Sanders County, Montana, less and excepting mesne conveyances, which are not relevant to this case.  The legal description of the property as to which Plaintiff seeks to quiet title on behalf of the heirs of the Estate is as follows:

> Government Lot 7 and Government Lot 8 in Section 14, Township 26 North, Range 33 West, P.M.M., Sanders County, Montana, less those portions described as follows:
>                    EXCEPTING
> All that part of Lots 7 and 8 in Section 14, Township 26 North, Range 33 West, M.P.M., in Sanders County, Montana, lying North of the former Northern Pacific Railway Right of Way (Volume 56 of Deeds, Page 235, Sanders County records);
>                    and
>                    ALSO EXCEPTING
> A tract of land in Government Lot 8 of Section 14 and the NE1/4 of Section 23, all in Township 26 North, Range 33 West, further described on Certificate

**Page 3  Plaintiff's Statement of Undisputed Facts**

of Survey No. 829, Sanders County records; according to deed recorded at Micro No. 62603, Reception No. 275720, Sanders County records.

The above-described property is hereinafter referred to as "the Finnigan Property."

2.     Under Section 2 of the Northern Pacific Railroad Company Land Grant Act of 1864, 13 Stat. 365, the Northern Pacific Railroad (NPR) was granted a right of way over certain sections of land that was 400' wide, being 200' on either side of the centerline of the rail line built within this right of way.  During the 1880s, the NPR constructed a rail line within this right of way on the south bank of the Clark Fork River in northwestern Montana.

3.     The NPR right of way traversed the Finnigan Property and also property located in an adjacent section that was involved in prior litigation in *Avista Corp. v. Sanders County,* 485 F.Supp.2d 1176 (D.Mont. 2007), *aff'd in part and rev'd in part, Avista Corp. v. Wolfe,* 549 F.3d 1239 (9th Cir. 2008).  *See* United States' Preliminary Pretrial Statement, Dkt#12 at 3.

4.     The NPR rail line was in place and being used by NPR when the patent to the Finnigan Property was issued to the predecessor of the Estate of Glowdena B. Finnigan.  The patent itself does not contain any mention of or exception or reservation for the NPR right of way.  The patent is attached as Exhibit 1.

5.     During the early 1950s, Washington Water Power Co. commenced construction of two hydroelectric dams on the Clark Fork River: one near Noxon, Montana (the Noxon Rapids Dam), and the other downstream on the Montana-Idaho

border (the Cabinet Gorge Dam). *Avista,* 485 F.Supp.2d at 1178-79; *see also* Exhibit 2, a map of the region. The impoundments created by these two dams eventually flooded significant portions of the NPR rail line on the south side of the Clark Fork River. *Avista,* 485 F.Supp.2d at 1178-79; Ex 3; Ex 4; (*Avista* Defendants' Ex 6 and Ex 7, referenced in *Avista* orders); *see also,* Ex 2.

6.    The NPR rail line from Trout Creek, Montana to the Idaho border was originally located entirely on the south side of the Clark Fork River. *Id.*

7.    In 1955, and as a result of the dam construction described above, the NPR agreed to abandon the right of way for the NPR rail line on the south side of the Clark Fork River and to relocate the NPR rail line to the north side of the River from a point approximately two miles west of Trout Creek, Montana, to a point approximately 4 miles west of Noxon, Montana. *Id.* The abandoned section of right of way on the south side of the River is hereinafter referred to as "the abandoned right of way." By late 1957, the rail line that once occupied the abandoned right of way had been relocated to the north side of the Clark Fork River, following the construction of railroad bridges across the Clark Fork River and approximately 20 miles of new rail line track. Ex 2; Ex 3; Ex 4; and Ex 5 and Ex 6 (*Avista* Defendants Ex 10 and Ex 11, referenced in *Avista* orders). By October 1958, NPR's abandonment of the abandoned right of way on the south side of the Clark Fork River was complete. *Avista,* 485 F.Supp.2d at 1182-85, *aff'd as to the determination of abandonment,* 549 F.3d at 1247-49.

8.    For rights of way granted under the NPR Land Grant Act of 1864, private ownership of railroad right of way later abandoned by the NPR may be governed by one of two federal statutes: 43 U.S.C. §912, which was enacted in 1922 as the Abandoned Railroad Right of Way Act; or 16 U.S.C. §1248(c), which was enacted in 1988 as part of the National Trails System Improvement Act of 1988, commonly referred to as the "Rails to Trails" law. Under §912, and with an exception for public highways not relevant in this case, a right of way abandoned by the NPR and confirmed by a decree of a court of competent jurisdiction or an Act of Congress becomes the property of persons to whom the United States may have conveyed title to the property traversed by the abandoned right of way. This transfer to private ownership was changed by §1248(c), which provides that for abandonments occurring after October 4, 1988, title to the abandoned rights of way "shall remain in the United States." For abandonments that occurred prior to the adoption of §1248(c), the legislative history confirms that §1248(c) applies only to "future abandonments" of railroad rights of way. Ex 7, S. Rep. No. 100-408, at 2611. The same legislative history also states that as to any abandonment previously confirmed by a court decree under §912, "the federal interest in the right-of-way would become the property of *any adjacent landowner* whose own title was based on a federal conveyance . . . through which the right of way passed." *Id.* at 2608.

9.     The Finnigan Property and the land involved in the *Avista* case are both traversed by the same abandoned right of way.  Dkt#12 at 3.

10.     On April 17, 1980, David S. Bennett filed an action in Sanders County District Court to quiet title to land also traversed by the same abandoned right of way.  *Bennett v. United States, et al*., No. 6262 (Sanders Co., Mont.  Nov. 25, 1980).  Exhibit 8 is a copy of the Complaint in the *Bennett* case.  The Complaint refers to the NPR right of way traversing the Bennett Property and includes the following allegations in Paragraph IV:

> That the legal description of said real property includes lands which were originally granted to the NORTHERN PACIFIC RAILWAY COMPANY, pursuant to Act of Congress, July 2, 1864; that the NORTHERN PACIFIC RAILWAY COMPANY, now BURLINGTON NORTHERN, INC., has abandoned the right-of-way affecting the above described real property; by virtue of the relocation of its railroad track and said land has not been used for any railroad purpose since on or about 1954.

This abandonment of right of way and relocation of the railroad track is the same abandonment and relocation confirmed in the *Avista* case and involved in this case for the Finnigan Property.  Ex 9, Claude I. Burlingame Declaration.  The location of the Bennett Property is shown on Exhibit 2.

11.     The United States was named as a Defendant in *Bennett* and filed a Disclaimer of Interest. *See* Ex 10.  The Disclaimer was signed on behalf of the U.S. Attorney for the District of Montana.  It "disclaims any interest on the part of the United States of America for the reason that the lands involved in the [*Bennett*

action] are all privately owned and the United States has no interest in this action."
*Id.*

12.    On November 25, 1980, the Sanders County District Court entered a Judgment and Decree in *Bennett*. See Ex 11.  The Judgment and Decree provides that "the allegations of the complaint are true," refers to "the abandoned railroad right-of-way traversing the property," and, with the exception of mineral rights previously reserved by the United States in the patent to the Bennett Property, makes no exception to Mr. Bennett's ownership of the Bennett Property.

13.    On September 27, 1985, Richard and Mary Olson filed an action in Sanders County District Court to quiet title to land also traversed by the abandoned right of way.  *Olson v. County of Sanders, et al*., No. DV-85-37 (Sanders Co., Mont. Oct. 13, 1987). The location of the Olson Property is shown on Exhibit 2.  Exhibit 12 is a copy of the complaint in *Olson*.  The *Olson* complaint includes the following allegations:

> Defendant Burlington Northern Railroad as successor to Northern Pacific Railway Company claims or may claim an interest in the property by reason of an easement over the property which Northern Pacific Railway Company once held pursuant to the Northern Pacific Railway Grant Act of July 2, 1864, but in approximately 1954 the Northern Pacific Railway Company abandoned the right-of-way for railroad use and pursuant to 43 USC 912 the right-of-way over the property so abandoned reverted to the underlying owner of the title to the property and the Defendant Burlington Northern Railroad has no right, title or interest in the property by virtue of the said grant to Northern Pacific Railway Company or any other theory of fact or law.

*Id. at* 2-3, ¶4.

14.    On October 13, 1987, the Sanders County District Court entered a Decree Quieting Title in *Olson*. See Ex 13. With the consent of the Defendant Burlington Northern Railroad, the Decree states that all of the Defendants "have no interest in the [Olson Property]." *Id.* at 3.

15.    In 1996, the Noxon Rural Fire District filed an action in Sanders County District Court to quiet title to its fire station located on property within the abandoned right of way (the "Noxon Fire Property"). The location of the Noxon Fire Property is shown on Exhibit 2. Exhibit 14 is a copy of the complaint in the *Noxon Fire*. The *Noxon Fire* complaint includes the following allegations:

> On or about 1897, the Northern Pacific Railway Company maintained a railroad track across portions of the parcel. The Northern Pacific Railway Company owned a fee simple interest in the 400-foot right-of-way across the portion of the parcel lying in Government Lot 9, Section 19, Township 25 North, Range 32 West, PMM. The Northern Pacific Railway Company owned a right-of-way by Act of Congress, 400 feet in width, being 200 feet on either side of the centerline of the railroad tracks, across the portion of the parcel lying in Government Lot 8, Section 19, Township 26 North, Range 32 West, PMM. The Northern Pacific Railway Company abandoned the railway right-of-way and railroad tracks across the parcel during 1951 through 1953.

> By reason of the Northern Pacific Railway Company's abandonment of its right-of-way, and the provisions of Title 43 of the United States Code, Section 912, the Plaintiff now owns any portion of the former railroad right-of-way lying within the exterior boundaries of the parcel. The surface rights incident to the railroad right-of-way across Government Lot 8, Section 19, Township 26 North, Range 32 West, reverted to the owner of the underlying fee.

*Id.* at 3. The abandonment of railroad right of way and railroad tracks that was alleged in *Noxon Fire* is the same abandonment confirmed in the *Avista* case and involved in this case for the Finnigan Property. Ex 9. In addition, the request for

confirmation of the reversion of ownership to the Noxon Fire District under §912 is the same request for confirmation of the reversion to ownership of the Finnigan Property that Plaintiff seeks in this case. *Id.*

16.    In *Noxon Fire* the United States was named as a defendant and stipulated that the Noxon Fire District "may take judgment as requested in the Complaint," subject only to the exceptions reserved in the United States' original patents to the Noxon Fire District. Exhibit 15 is a copy of this stipulation, which was issued by the office of the Montana United States Attorney.

17.    On November 12, 1996, the Sanders County District Court entered a Judgment and Decree in *Noxon Fire*, quieted title in favor of the Noxon Fire District, and stated that "the allegations of the Complaint are true." Ex 16 at 3.

18.    By deed dated October 1, 1958, NPR attempted to convey several parcels of land included within the abandoned right of way to Sanders County. *Avista,* 485 F.Supp.2d at 1179; see also Ex 17 (*Avista* Defendants Ex 15, referenced in *Avista* orders). One of the parcels included in the abandoned right of way that NPR attempted to convey to Sanders County was the part of the abandoned right of way that traversed the Finnigan Property in Govt. Lots 7 and 8 in Section 14, T26N, R33W, P.M.M. Ex 17 at 2, ¶6. Sanders County did not accept this deed until February 8, 1961, and did not begin public use of a road over the abandoned right of way until the early 1970s. *Avista,* 485 F.Supp.2d at 1179; Ex 18 & Ex 19 (*Avista* Defendants Ex 18 and Ex 20, referenced in *Avista* orders).

19.     Because of the cloud on Plaintiff's title created by the NPR deed to

Sanders County, Ex 17 ¶6, Plaintiff's predecessor in interest, Glowdena B. Finnigan,

filed an action in Sanders County District Court on May 2, 1996, in order to quiet

title to the abandoned right of way.  Exhibit 20 is a copy of the complaint filed in

*Finnigan*.  In pertinent part, the complaint alleges as follows:

III.

At sometime prior to 1958, the exact dates of which are unknown, the
Northern Pacific Railway Company maintained a railroad track across
portions of the above-described property, for which the Company had a 400
foot right-of-way being 200 feet on either side of the center line of the
railroad tracks; the Northern Pacific Railway Company abandoned the right-
of-way across the above-described property.  This abandonment occurred at
sometime prior to October 1, 1958 . . . .

IV.

By reason of the Northern Pacific Railway Company's abandonment of its
right-of-way, and the provisions of 43 USC § 912, the Plaintiff now owns
any portion of the former railroad right-of-way lying within the exterior
boundaries of the above-described property.  The surface rights incident to
the railroad right-of-way reverted to the owner of the underlying fee, with
the exception of such parts thereof as may be embraced in a public highway
legally established in accordance with the provisions of 43 USC §912.

*Id.* at 3.

20.     In *Finnigan*, a disclaimer of interest was filed by the Burlington

Northern Railroad Company (BNR), as the successor in interest to NPR.  In this

Disclaimer, BNR disclaimed any right, title or interest in the Finnigan Property and

agreed that the court could enter an order declaring that the portion of the railroad

right of way that formerly crossed the Finnigan Property was abandoned by NPR at some time prior to October 1, 1958.  Ex 21.

As a means of settling any claim by Sanders County, deeds were executed by Sanders County and Glowdena B. Finnigan by which the County quitclaimed any interest in the abandoned right of way, and the County was given a 60-foot easement for its existing County road, which is the same County road as the one involved in *Avista.*  Ex 9; *see also, Avista,* 485 F.Supp.2d at 1179, 1187, 1189-90; 549 F.3d at 1248, n.9, 1249, 1251-52.  Exhibit 22 and Exhibit 23 are copies of these deeds.

21.     On December 10, 1996, the Sanders County District Court entered a judgment in *Finnigan*.  Ex 24.  The *Finnigan* judgment provides in pertinent part as follows:

> At sometime prior to 1958, the exact dates of which are unknown, the Northern Pacific Railway Company maintained a railroad track across portions of the above-described property, for which the Company had a 400 foot right-of-way being 200 feet on either side of the center line of the railroad tracks; the Northern Pacific Railway Company abandoned the right-of-way across the above-described property.  This abandonment occurred at sometime prior to October 1, 1958.

*Id.* at 2-3.

The judgment recited the existence of the BNR's disclaimer and the execution of the reciprocal deeds by Sanders County and Glowdena B. Finnigan, and ordered that the originals of these deeds "be recorded with the Sanders County Clerk and Recorder."  *Id.* at 3.  Finally, the judgment also confirmed the agreement

by Sanders County that, in exchange for the 60-foot easement granted for the existing County road, Sanders County "shall take no further action to establish any public roads, highways or other facilities" within the Finnigan Property. *Id.*

22.    The United States has never occupied, used, or asserted any regulatory or administrative authority as to the Finnigan Property. SUF ¶25.

Dated this 20th day of January, 2019

/s/Timothy M. Bechtold

Attorneys for Plaintiff

# Exhibit 1

Missoula 03253

A-1929-R.

# The United States of America,

To all to whom these presents shall come, Greeting:

WHEREAS, a Certificate of the Register of the Land Office at **Missoula, Montana,**

has been deposited in the General Land Office, whereby it appears that, pursuant to the Act of Congress of May 20, 1862, "To Secure Homesteads to Actual Settlers on the Public Domain," and the acts supplemental thereto, the claim of **Lottie Moore Finnegan, formerly Lottie Moore,**

has been established and duly consummated, in conformity to law, for the **Lots seven and eight of Section fourteen in Township twenty-six north of Range thirty-three west of the Montana Meridian, Montana, containing forty-six acres and sixty-three hundredths of an acre,**

according to the Official Plat of the Survey of the said Land, returned to the GENERAL LAND OFFICE by the Surveyor-General:

NOW KNOW YE, That there is, therefore, granted by the UNITED STATES unto the said claimant      the tract of Land above described: TO HAVE AND TO HOLD the said tract of Land, with the appurtenances thereof, unto the said claimant      and to the heirs and assigns of the said claimant      forever; subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights, as may be recognized and acknowledged by the local customs, laws, and decisions of courts; and there is reserved from the lands hereby granted a right of way thereon for ditches or canals constructed by the authority of the United States.

IN TESTIMONY WHEREOF, I,   **Warren G. Harding,**

President of the United States of America, have caused these letters to be made Patent, and the seal of the General Land Office to be hereunto affixed.

GIVEN under my hand, in the District of Columbia, the   **THIRD**

day of   **AUGUST**   In the year of our Lord one thousand nine hundred and   **TWENTY-TWO**   and of the Independence of the United States the one hundred and   **FORTY-SEVENTH.**

By the President:

(SEAL.)

As custodian of the public records retained by the Bureau of Land Management, Billings, Montana I hereby certify this to be a true copy

Dated **JUN 27 1977**

Vivian M. Boynton    *Vivian M. Boynton*
Survey Records Clerk

*Warren G. Harding*

By    *Ada Braddock* Assistant Secretary.

*John O'Connell*

Acting    Recorder of the General Land Office.

RECORD OF PATENTS: Patent Number    **874307**

# Exhibit 2



**Finnigan**

**Hampton**

**Noxon Rural Fire**

**Olson**

**Abandoned South Bank Railroad**

**Relocated North Bank Railroad**

**Bennett**

# Exhibit 3

AGREEMENT made and entered into this 16th day of July, 1955, by and between WASHINGTON WATER POWER COMPANY, a Washington corporation, hereinafter called "Power," and NORTHERN PACIFIC RAILWAY COMPANY, a Wisconsin corporation, hereinafter called "Railway,"

W I T N E S S E T H :

WHEREAS, Power desires to construct, operate and maintain a hydro-electric power dam and reservoir known as the Noxon Rapids Hydro-electric Development on the Clark Fork River in Sanders County, Montana, which will raise the surface of the waters of the said Clark Fork River under normal flow to a pool elevation of 2331 feet above mean sea level U.S.C. & G.S. Datum at the spillway of said dam; and

WHEREAS, the main line of Railway's transcontinental railroad constructed mainly upon a 400-foot right of way granted by the Act of Congress approved July 2, 1864 (13 Stats. 365) and also upon other rights of way acquired under various conveyances extends along the south side of the Clark Fork River adjacent to said proposed dam and reservoir, and will be partially inundated and otherwise damaged by the construction of said dam and reservoir, unless relocated, altered, recon-structed and otherwise protected, as hereinafter provided; and

WHEREAS, in order to avoid damage to Railway and to obtain the right, insofar as Railway may lawfully grant the right, to store and flow waters upon, over and across the portions of the existing right of way of Railway which will be inundated by the construction and operation of said dam and reservoir, Power is willing to relocate, alter, reconstruct, and otherwise protect, at its sole cost and expense, the line of railroad of Railway in the vicinity thereof so as to provide it with a line of railroad which after the construction of said dam and reservoir will be not less than the equal of that now in existence in grade, appurtenances, facilities, safety, stability, and convenience and economy of maintenance and operation, insofar as it is practicable to do so; and

WHEREAS, in consideration of the covenants and agreements of Power, hereinafter set forth, Railway is willing to cooperate in the performance of

2

relocating, altering, reconstructing and protecting its said line of railroad by furnishing certain materials and performing certain portions of the work, at the sole cost and expense of Power, and is willing to furnish, at its own expense, certain track metals, in order that said work may be completed with the minimum delay and expense, and with maximum safety, efficiency and operating convenience.

NOW, THEREFORE, in consideration of the premises, it is mutually agreed as follows:

## ARTICLE I

### RIGHT OF WAY

Section 1.  Power covenants and agrees that it will, at its own sole cost and expense, acquire and convey to Railway by deed or other instrument satisfactory to Railway, supported by acceptable evidence of title, all additional lands and right or interests in lands necessary to provide Railway with a continuous right of way for its tracks and other railroad facilities, so that said tracks and facilities may be relocated for the entire length safely above pool elevation 2331 plus maximum flood backwater effect as shown on profiles included in Exhibit "B."  Such right of way on relocated portion of track shall have a minimum width of 100 feet each side of the relocated track centerline with increased widths as necessary to provide minimum berm clearances of 50 feet from top of slope excavations or toe of embankment slopes or as otherwise required to meet special local conditions;  such additional right of way widths shall be provided with reasonable uniformity for continuous sections to encompass the maximum requirements each side of the centerline of relocated trackage and shall not be adjusted indiscriminately to provide undesirable irregular additional width arrangements;  additional widths of right of way will also be provided for relocated station facilities at least equal to land areas prevailing at existing station sites, all as required by Railway.

- 2 -

furnish to Railway, all necessary permits for crossings of the Bonneville Power electric transmission lines, and/or other private or public electric transmission or communication lines, and suitable releases, acceptable to Railway, from any and all costs, claims or damages arising out of such crossings of relocated railway and electric power transmission or communication lines. Power will also, at no cost or expense to Railway, arrange for any necessary revisions to construction of the electric power transmission or communication lines to accommodate such required crossings. Power will also, at no cost or expense to Railway, arrange for relocation of existing electric power transmission lines where necessary or provide suitable other means, to the complete satisfaction of Railway, to avoid inductive interference to communication lines of Railway and tenant companies.

Section 3. Upon completion of the work contemplated by this agreement and the acceptance thereof by Railway, Railway shall grant Power, to the extent that it may lawfully do so, the right to store and flow water upon, over and across so much of its existing right of way and other lands devoted to railroad operations and any facilities and improvements then remaining thereon and not otherwise herein disposed of or provided for which lie below said pool level, including backwater effect as shown on profiles included in Exhibit "B", created by water level at the Noxon Rapids Dam to elevation 2331 above mean sea level U.S.C. & G.S. datum and which will be inundated by the construction and operation of said dam and reservoir. It is expressly understood that such conveyance shall be subject to any and all legal limitations to which the title of Railway to its existing right of way is subject under said Act of Congress of July 2, 1864, and shall also be subject to the rights or claims of others for public or private utilities, roads and other facilities now located thereon, except railroads and their communication facilities. With respect to the conveyance or conveyances to be made under this Section 3, Power shall rely solely upon its own investigation of the premises to be conveyed and the title thereto, despite any information given or act or omission by Railway. Railway, by execution of this agreement,

elevation of the pool at the Noxon Rapids Dam to an elevation of more than 2331 feet, or raises the level of the backwater curve above that shown on profiles included in Exhibit "B." Wherever the term, "pool elevation 2331," appears in this agreement, it is agreed that this pool level is subject to temporary fluctuations above such elevation resulting from wave, surge, or seiche actions due to wind and other uncontrollable and unpredictable forces and that such fluctuations shall not be considered a departure from the stated elevation.

## ARTICLE II

### PLANS AND SPECIFICATIONS

Section 1. The parties agree that, as soon as may be, the line of railroad of Railway in the vicinity of said proposed dam and reservoir shall be relocated, altered, protected, reinforced and reconstructed, in conformity with the following drawings which are identified by the signatures of the Project Manager representing Power, and the Chief Engineer of Railway, and are hereto attached, marked respectively, Exhibits "A" and "B," and hereby made a part of this agreement:

(1)  Exhibit "A," entitled, "Noxon Rapids Hydro-electric Development, Proposed Relocation of Northern Pacific Railway," being a general plan showing the proposed new location of the railroad and right of way of Railway and the general nature of the work to be done, including portion of present roadway and bridges to be altered, protected and reinforced.

(2)  Exhibit "B," consisting of         sheets, numbered         to    , including, but not limited to, maps, plans and profiles of the relocated and raised portions of the tracks, present roadway and bridges to be altered, protected or reinforced, backwater curve profiles, station maps, construction plans of buildings, bridges and other drainage structures, and all other necessary plans, maps or drawings.

4

Section 2. All su ... , preparation of detail dra ... gs and speci ...
tions necessary and proper to the complete carrying-out of the work to meet
Railway requirements in conformity with this agreement and the drawings and
specifications set forth in Section 1 above, shall be made and prepared by
Power or its engineers and consultants at Power's sole cost and expense and be-
fore any work thereunder shall be commenced, they shall be approved and signed
by both the Project Manager for Power and the Chief Engineer of Railway, or
their authorized representatives, and a signed copy of each thereof shall be
furnished by Power to each of the parties hereto for attachment to this agree-
ment and shall thereupon become a part thereof by this reference. Such detail
drawings and specifications shall include, but not be limited to, plats, pro-
files and plans covering all surveys, contour maps, land maps with section ties
to location of relocated railway track, drainage areas for culverts, backwater
curves for normal pool level, maximum drawdown level, maximum flood stage for
195,000 second feet flow at new dam and extending upstream about to Railway
Mile Post 32, profile of present river bed with flood stage level for 195,000
second feet flow between the same limits, complete plans for any and all new
permanent or temporary trackage, buildings for all purposes, sewers, water supply,
signal and communication facilities, railway and highway bridges, culverts, road-
ways, riprap protection, bank reinforcement, soil stabilization measures or any
other Railway facility, alterations to existing trackage, bridges, culverts,
buildings, roadbed or any other Railway facility. All plans shall be submitted
in reasonable time to permit complete check and approval thereof by Railway in
advance of start of the work by Power contractor.

Section 3. By mutual agreement in writing between the Project Manager
for Power and the Chief Engineer of Railway, changes and alterations may be
made from time to time in said approved drawings and specifications.

Section 4. Power shall furnish Railway without charge not less than ten
complete sets and one reproducible tracing on cloth of all drawings and specifi-
cations prepared by it or for it in connection with the work covered by this

out charge and before work covered thereunder is commenced with ten conformed copies each of all contracts entered into by Power in connection with the railroad relocation project. Monthly quantities of progressive work shall be furnished Railway.

Section 5. Detailed plans and specifications prepared for the protection, alteration, relocation or reconstruction of Railway facilities shall conform in general to the following basic criteria:

a. Alignment and grade: As indicated on Exhibit "B." Ruling grades shall not exceed 0.1% compensated at the rate of 0.04% per degree of curve eastbound or 0.5% compensated at the same rate westbound. Curvature shall be as light as is economically possible and in no case shall curves sharper than 3 degrees be employed. Maximum grade for east half of passing track for the Noxon relocations and 5000 feet of main line track east thereof shall not exceed 0.3% compensated.

b. Bridges: New bridges to be constructed on the relocated line shall be of open deck structural steel plate girders or trusses having treated timber walks and railings on one side, all supported by reinforced concrete foundation structures on piling, if necessary, extending above the maximum flood stage level to provide not less than six foot clearance of low steel above high water. Steel structures shall be designed for E 65 loading in accordance with current AREA specifications as modified by Railway design practice. Alterations to Bridge 36 will consist of reinforcement and extension of Piers 3, 4, 6, and 7 and raising of bearings of Piers 3 and 7 and concrete encasement of steel built-up pedestals of Piers 4 and 6 to provide adequate protection from maximum flood stage and ice action. Bridge 50 shall be relocated on short line change and may consist of three secondhand seventy-foot deck plate girder spans removed from existing Martin's Creek viaduct, or in the event such Bridge 50 relocation is undertaken before Martin's Creek

6

viaduct girder spans are available and new bridge steel is therefore furnished, the girder spans removed from the existing Bridge 50 may then be used for bridges over Swamp and/or Rock Creeks on the relocation alignment. In either case, the spans shall be placed on new reinforced concrete spill-through type abutments and concrete piers with foundation piles, if necessary. Alterations to Bridge 55 shall consist of replacing existing steel tower bents with reinforced concrete piers and new bearings safely above maximum flood stage level, either by encasing such tower bent steel in adequate concrete pier design with provision for new bearings on such piers, or by providing new concrete piers longitudinally adjacent to existing tower bents with steel spans to be shifted to such piers. All foundation piling and all concrete substructures shall conform to Railway practices and specifications. Power shall arrange for complete exploratory borings at all bridge sites to determine existing foundation conditions. All bridge design and shop drawings shall be made on sheets 24" x 36" in size. Power shall furnish Railway with shipping weights of each piece of structural steel and copies of chemical and physical test reports of material in steel bridges.

    c. Culverts: Design of culverts for the relocated line and for those locations along the existing line where additional protection requires installation of additional culvert openings, shall in general be in accordance with the Railway's current practice and specifications for main line installations.

    d. Track rail and fittings: The relocated main line, including turnouts from such main line, will be constructed of new 115# rail and fittings, except for curves of 2° and over which will be constructed of new 132# rail and fittings, all in accordance with Railway's current standard practices and specifications. Passing tracks, sidings, industry tracks, etc., beyond the main line turnouts shall be constructed of secondhand rail and fittings of weight not less than 100#, as available by Railway.

    e. Ties: Track ties to be used for the relocated line shall be 7" x 9" x 8'-6" Grade 5 softwood of Douglas Fir, Larch, Western Yellow Pine, or Lodgepole Pine species for the main line tangents, Hardwood 7" x 9" x 8'-6" Grade 5 for main line curves and Softwood species 7" x 8" x 8' for passing tracks, sidings and industry tracks; Douglas Fir switch ties conforming to Railway

- 7 -

g. Roadbed:  In general, and unless otherwise specifically required, following review of detail plans and conditions on the ground, roadbed design shall provide the following:  subgrade width (at bottom of pitrun gravel sub-ballast section) of not less than 25 feet for single track embankment sections, other than those through backwater pool sections where a width of 30 feet shall be provided, and not less than 22 feet for excavation sections.  Widths of excavations shall be not less than 44 feet at single track subgrade level and shall include well-graded ditch sections at a sloped depth of not less than 2 feet below subgrade level each side of the roadbed section, with further provision that in long or deep cuts, widths of excavations shall be increased in amounts to be specified by Railway, dependent on conditions prevailing at the individual cuts, to facilitate side casting of deep snow by plowing, and further, if Railway deems necessary, side drain openings shall be cut to face of hill on river side to facilitate drainage from such long and/or deep cuts.  Excavation slopes shall be 1½ to 1 in common material, and 4 to 1 in clay silt, and 3/4 to 1 in rock, unless conditions as determined by Railway dictate otherwise.  Excavation in rock shall be carried to six (6) inches below subgrade and backfilled to subgrade level with suitable granular material.  All rock excavations shall be provided with berms 12 feet wide at an elevation 20 feet above top of tie.  Except as elsewhere specifically provided, embankment slopes shall be 1.3/4 to 1 for common material, and 1½ to 1 for rock material.  All embankments, constructed by dumping material under existing water level, shall consist of rock fill to an elevation of 5 feet above existing water level, except for embankments to be constructed in the Cabinet Gorge backwater pool where fills will consist of rock to an elevation of 5 feet above Cabinet Gorge maximum flood backwater elevation; widths of such rock fills shall be of sufficient width to provide berms 5 feet in width at the junction of earth and rock fills, and to provide the 30 foot roadbed width specified above.  For those portions of embankment which will later be subjected to the Noxon Rapids reservoir backwater pool, in the event sufficient rockfill material is not available to entirely construct such fills, select

9

compacted common material which, in the opinion of Power's consulting soils engineers, will remain stable under saturated and drawdown conditions for the slopes employed may be used with provision that slopes of such select compacted common material above the rock base berm specified above shall be no steeper than 3 to 1 and such entire slopes shall be further protected by a blanket of riprap, having a minimum thickness of 3 feet normal to the slope, with an increased thickness where subject to ice action, to an elevation of at least 5 feet above maximum flood backwater elevation. All high fills and fills in water shall be widened a sufficient amount to allow for subsidence and shrinkage. Locations of unsuitable subgrade or foundations shall be stabilized to secure satisfactory foundation conditions by methods as directed by Power's consulting soils engineers. Where embankment of relocation construction intercepts existing sidehill drainage and adequate drainage facilities are not or cannot be provided to convey such drainage under the track embankment, or where such sidehill drainage is intercepted by relocation excavation, adequate intercepting ditches or dikes or combinations of both shall be provided to carry such intercepted drainage laterally along the relocation construction to waterways where such drainage can be properly handled. Such diversions must diverge sufficiently to prevent erosion of the embankment or excavation slopes and, if required, shall be constructed in advance of opening of relocation excavations or placement of embankments. Widen roadbed design sufficiently to provide for motor car setoffs, signal facilities, switch stands and any other Railway facilities.

h. Communications facilities: A complete system of communication facilities, including telephone and telegraph line wires and specialties, including those solely and jointly owned by the Railway and Western Union, as well as pole line tenant facilities, shall be constructed along the relocated main line, as designed and specified by and acceptable to Railway and its tenants.

i. Signal facilities: A complete railway signal system, including, but not limited to, block signals, train order signals, highway grade crossing signals, rock and/or slide detector fences, mud slide detector fences, snow detector fences, and fill slip detectors, shall be constructed along the relocated main line, as required in the reasonable judgment of and as designed and specified by

— 10 —

Railway.    In addition, install fill slip detectors at locations required by Railway for its roadbed between Mile Posts 35 to 56.

j.  Station Building and facilities:  Complete station facilities equal to those existing on the present main line including, but not limited to, depots, agent, operator and section labor living quarters, motor car and tool houses, material platforms and storage facilities, sewers, water supply, electric service lines, mail cranes, phone booths and any other necessary railway facilities, shall be constructed along the relocated main line for services similar to those on line to be relocated.

k.  Crossings:  All crossings of public and private roadways by the relocated main line and auxiliary tracks shall be provided with adequate crossings and protection in accordance with current Railway standard plans and practices in this area and as may be required by public authorities.   Crossings of public roadways shall be of pre-cast reinforced concrete plank design, and crossing of private roadways shall be of no less than treated timber design.   Inasmuch as the present alignment of the railway within the limits of the relocation does not include any crossings of U. S. Highway #10A, any crossings of such highway necessitated by the relocation shall be served by adequate grade separation structures acceptable to Railway and the Montana State Highway Department.   In agreements negotiated by Power with the State Highway Department for construction and maintenance of such grade separation structures, Railway shall not be obligated to bear any of the cost of construction or maintenance of such structures.   Submit preliminary and final plans, specifications, and agreements for approval by Railway.   Furnish plans, specifications and agreements for all highway structures over, across or under Railway tracks.

l.  Signs:  The relocated line shall be completely equipped with signs as required by Railway, and installed in accordance with Railway's latest standard plans and current practices.

m.  Fencing:  The relocated line shall be fenced as required with adequate right of way fence conforming to Railway current practices and standard plans or State laws.  Install snow fences as reasonably required by Railway.

- 11 -

n. Protection to existing facilities:  Existing facilities, not relocated but affected by the backwater pool, including, but not limited to, roadbed, track, culverts, bridges, signals, communication lines and other facilities upstream from the line relocation (and those left in place on the abandoned alignment), shall be strengthened, protected, adjusted or otherwise altered, as required by the findings of detail surveys to provide adequately for the protection of the property in the reasonable judgment of Railway.  In addition to the precautions and provisions set forth elsewhere in this agreement regulating work in danger-ous proximity to operated trackage, Power agrees that Railway shall have auto-matic authority to invoke protective work measures, such as, but not limited to, watchman and flagmen service, cabling of communication and signal lines, temp-orary relocation or adjustment of operating facilities or shooflies and detours.

Section 6.  Within six months after completion and acceptance by Railway of the work covered by this agreement, and after request therefor by Railway, Power shall provide Railway with one set of reproducible tracings on cloth and one set of blueprints of drawings accurately showing the work as actually com-pleted and accepted, including accurate location maps showing section ties to the relocated alignment.

Section 7.  At locations where highways parallel relocated track, Power shall install suitable protective facilities, such as guard rails, etc.  Power shall submit all plans and agreements for approval by Railway to cover such locations.  Agreements negotiated by Power with others shall prohibit deposit-ing snow or slide material on Railway roadbed from highway snow or slide ro-moval operations.  Railway will assume no initial construction, maintenance, or reconstruction expenses in connection with such locations and construction.

....ard plans as to sizes and lengths; all in accordance with Railway Speci-
fication E-128 for green ties and Douglas Fir bridge ties of sizes shown on
approved bridge plans; all to be treated after proper air seasoning, preboring
and incising in accordance with Railway's current treatment practice, as employed
at its treating plants. All ties will be furnished by Railway if requested by
....wer and will be delivered to a specified material yard site.

f. Ballast and Subballast: Except when otherwise specified, subballast
placed on the subgrade of relocated portions of trackage, including main line,
....assing tracks, sidings and industry tracks, shall be comprised of four (4)
inches of suitable, well-graded stable pitrun gravel, with not over 2% clay,
....ceptable to Railway. In the cases of passing tracks, sidings or industry
....racks, immediately adjacent to the main line where it is desired to maintain
adjacent tracks at same elevations, the depth of subballast to be placed under
...he adjacent secondary track shall be increased sufficiently, or subgrade under
....uch track constructed sufficiently higher, so that final level of such track,
taking into account the final raises of ballast under both tracks, shall be at
....he same elevation as the adjacent main line. Preliminary operating ballast
for the main line portion of the relocated line, as well as final ballast for
....assing tracks, sidings and industry tracks, shall be comprised of six (6)
inches under the ties and a filling of the tie cribs with processed gravel,
acceptable to Railway, all placed in accordance with current ballasting prac-
tice of Railway. Final ballast for the relocated main line, to be placed after
proper operating seasoning period as determined by Railway, shall consist of an
eight (8) inch raise on crushed rock ballast, conforming to Railway specifications
and to be made by Railway in accordance with their then current ballasting prac-
tices. Main line ballasting will be followed, after a further operating period
of not less than one year, by power tamping by Railway forces and equipment for
maximum ultimate compaction of all crushed rock ballast. Crushed rock ballast
materials, if furnished by Railway, will be delivered to a specific material
yard site at rates provided elsewhere in this agreement.

8

WORK TO BE PERFORMED AND MATERIALS FURNISHED BY POWER

Section 1.  Power covenants and agrees that it will, at its own sole cost and expense, furnish all surveys, plans, materials except as otherwise provided, labor, tools, equipment, engineering services, and supervision necessary to perform, and will perform, in conformity with the approved general and detailed drawings and specifications referred to in Article II hereof, the following work:

a.  Provide a relocated line of main line trackage, complete with all necessary auxiliary trackage, and all attendant facilities, including signal and communication systems, station and section buildings and services between approximately Mile Post 56 and Mile Post 74, and between Mile Post 49 and Mile Post 52 of the existing main line in the location shown on Exhibit "A."

b.  Provide all necessary drainage structures, including river crossings and other bridges, also alterations to existing bridges; together with culverts, drainage ditches and underdraws along the relocated line and that portion of the existing line affected by the backwater pool.

c.  Riprap as approved by Railway or otherwise protect all railroad subgrade against possible adverse effects which will result from the establishment of the reservoir.  The necessity for such protection shall be determined by consideration of the effects of a flow of 195,000 cfs through the reservoir with forebay at elevation 2331 at the dam.  Top of riprap or protection having minimum thickness of 3 feet) normal to slope shall extend not less than 5 feet above backwater pool produced by flow of 195,000 cfs.

d.  Reimburse Railway for construction of all temporary track connections and operated tracks necessary to accomplish any and all construction work without interference to railroad operation.

e.  Provide all necessary public or private road crossings, access roads, grade separations and crossing signals or any other attendant construction as may be legally or otherwise required within the limits of the relocated railroad roadbed.

f.  Remove the embankment fill and, if necessary, culvert structures from those portions of the abandoned line as required to facilitate flow of waters in the impounded backwater from one side of the abandoned embankment to the other.

g. Grade temporary material yard areas. Install and remove all temporary material yard tracks complete.

h. It is understood that, in connection with the relocation of main line of Railway between approximate Mile Posts 49 and 52 in the vicinity of Beaver Creek, Power may use 115# rail, track metal, and track ties approved by Railway released from existing track west of Mile Post 69.5 in the vicinity of Noxon Station. In the event the relocation between Mile Posts 49 and 52 is undertaken first, the 1951 115# rail, track metal, and track ties approved by Railway released from such relocation may be used in the relocation between Mile Posts 56 and 74. For any such rail and track metal re-used in main line track, rail ends and angle bars shall be match marked for reinstallation.

i. Remove the abandoned line of railroad, including auxiliary trackage, signal and communication systems, bridges, buildings and other facilities. Salvage belonging to Railway and salvage purchased from Power by Railway, all as provided in Article VII, shall be delivered loaded on cars at the material yard.

Section 2.

a. All work to be performed by Power shall be done in a first-class workmanlike manner in accordance with detail plans specified elsewhere in this agreement and in accordance with Railway and/or AREA standards and specifications, unless otherwise herein specified.

b. Power shall obtain all necessary permits and licenses required by law for the performance of the work covered by this agreement.

c. In the event Railway labor organizations prohibit installation and removal by contract of temporary material yard tracks, signal and communication systems, also culvert and protection work along its existing roadbed, then Railway forces shall handle such work at expense of Power to cover all costs.

Section 3. Power further covenants and agrees that upon completion of the work hereunder, it will furnish Railway with an itemized statement showing location, quantities, classifications, unit prices, and cost of material and labor entering into the work done and the facilities furnished by Power under this agreement, all in accordance with the classification of accounts prescribed by the Interstate Commerce Commission for steam railroads.

- 14 -

ARTICLE IV

## MATERIALS TO BE FURNISHED BY RAILWAY AT ITS EXPENSE

Section 1.

a.  Railway will furnish without cost to Power an amount of 115# rail and necessary fastenings, including two 115# switches, frogs, guard rails, switch stands, and miscellaneous metal fittings for two turnouts complete, equivalent to the length of 100# rail included in existing main line trackage to be replaced by relocation or reconstruction.  This material will be unloaded by Railway at Power material yard.

b.  Railway will furnish without cost to Power, except for transportation charges to the job, secondhand track rail and metal fastenings for auxiliary trackage beyond main line turnouts.  Materials will be furnished on cars delivered to Power material yard and shall be unloaded by Power at its expense.


## ARTICLE V

## WORK TO BE PERFORMED & MATERIALS TO BE FURNISHED BY RAILWAY

Section 1.  Railway will furnish, at the sole cost and expense of Power:

a.  All crushed rock ballast material which Power may request Railway to furnish for the work, at $4.00 per cubic yard, fob cars at site of work.

b.  Railway will furnish treated cross, bridge, and switch ties at actual cost, loaded on cars at Power material yard, in the event Power is unable to procure ties from outside sources to meet Railway specification requirements. Power will unload cars at its sole expense.  Power must advise Railway not later than April 30, 1955, if ties are to be secured from Railway plants, as ample period of time is required for air seasoning of green ties during warm weather period.

c.  If requested by Power, all material, labor, tools, equipment, engineering and supervision necessary to remove the abandoned line of railroad, including auxiliary trackage, signal and communication systems at actual costs, as defined elsewhere in this agreement, also bridges, all buildings and all other facilities.

d.  Work train service, as required by Power, at actual cost.

e.  All track material, labor, tools, equipment, engineering and supervision necessary to construct connections of the relocated line and temporary trackage connections to the existing line of operated trackage at actual cost rates, as defined elsewhere in this agreement.

- 15 -

f.  Use for construction spur purposes of auxiliary trackage at Noxon, and 100# main line trackage, ownership of which remains with Railway under provisions of Article VII, at annual rental rate of $1,296 to be paid in monthly installments.    Railway will also furnish track materials necessary for construction of additional interchange and switching tracks near west end of the relocation to serve that portion of the line to be abandoned between the dam site and the west end of the relocation, which will be left in place temporarily for use as a construction spur.    Power to construct and later remove or reimburse Railway for "actual cost" of construction and later removal of such trackage.    In addition to rental charges stated above, Power will reimburse Railway in monthly installments at the rate of 1% per annum on inventory value of track materials used in construction of such additional required interchange or switching trackage.    In lieu of paying rental charges on inventory value of track materials involved in interchange, switching tracks and 100# main line and auxiliary trackage at Noxon, remaining in use as a construction spur, Power may deliver to Railway an equal amount of rail and other track materials removed from the abandoned main line in exchange for those materials which remained in Railway ownership.    Power will also reimburse Railway for necessary maintenance of construction spur and interchange and switching trackage at 'actual cost" as defined elsewhere in this agreement.

g.  Services of flagmen, watchmen, section patrolmen, linemen, signal maintainers and telegraph operators, as may be deemed necessary by Railway or as hall be requested by Power or its contractors, to protect the operations of Railway and the operations of Power or its contractors during construction covered by this agreement.

h.  All material, labor, tools, equipment, engineering and supervision necessary to rehabilitate, as required, roadbed and ballast sections which have iffered damage from protective measures undertaken along existing trackage, as provided in paragraph c, Section 1 of Article III of this agreement.

i.  Engineering design and specifications for complete communication and signal facilities, as provided in paragraphs h and i, Section 5, Article II of this agreement.

Section 2.  Work to be performed and materials to be furnished by Railway, at the sole cost and expense of Power, shall be furnished at "actual cost" to Railway.   "Actual Cost," as used herein, shall include:

a.  Cost of labor, materials and engineering directly employed in the work, computed at current salaries, wages and replacement prices paid by Railway as shown by its records, except that in the case of secondhand materials the inventory prices thereof shall be used.

b.  Rental of equipment, including work trains, employed on the work, computed at reasonable rates to be established by Railway, but not exceeding its "ownership expense," computed in accordance with the then current recommendations published by the Associated General Contractors of America, Inc. or Railway cost data.

c.  Transportation charges at tariff rates for transportation of all materials, except ballast material covered by paragraph a, Section 1 of this Article V, and rail and track metal covered by Section 1a, Article IV.

d.  General supervision and overhead expense, computed by applying the following percentages to the amounts charged as above provided for labor and for materials, respectively;  provided, however, that for materials, which are procured and shipped to the job site direct without clearing through Railway's normal storehouse, the Purchase Expense additive of 2% only shall apply, plus any amounts actually expended for storage at the job site, and that for all materials, which clear through Railway's normal storehouse, the total additive of 17% shall apply:

Labor

| | |
|---|---|
| Supervision.............................. | 6.2% |
| RR Retirement & Unemployment Comp...... | 6.0% |
| Vacation and Holiday Allowance.......... | 6.3% |
| Accident Insurance...................... | 3.0% |
| Depreciation and Use of Tools.......... | 1.0% |
| TOTAL............. | 22.5% |

—17—

Material

    Storehouse.............................. 15%

    Purchase Expense....................... 2%

              TOTAL......... 17%

The foregoing percentages may be varied by mutual consent of the parties hereto, and shall be equitably adjusted to conform to any changes in tax rates for railroad retirement and unemployment compensation or vacation allowance that may hereafter occur during construction period. Hospital and/or medical expense, resulting from changes in labor agreements, shall be recognized as costs reimbursable at an actual percentage to be applied to direct charges, such charges not being included in the above breakdown.

Section 3.

a. In addition to direct engineering employed by Railway on work covered by paragraphs c, e, h, and i of Section 1 of this Article V, Railway may furnish, at sole cost and expense of Power, one Assistant Engineer, one or more Resident Engineers, and Inspectors as considered necessary and one Stenographer-Clerk for proper control, check and approval of work by Power or its contractors; and two or more Supervisors or Inspectors to inspect construction of Communication lines and facilities and signal facilities by Power contractor. Railway personnel shall have complete control to require Power to stop work by Power contractors if their work is found unsatisfactory. All defective work shall be corrected, as required by Railway Engineers. Power shall reimburse Railway for all actual costs, including salaries, payroll additive charges, expenses, supplies, office space, equipment, rental and all operating costs of automobiles, when used solely for the prosecution of the project.

b. In the event that Railway engineering forces do not have available time to check the major bridges to be designed under this contract, Railway reserves the right to employ, at expense of Power, a consulting engineer or engineers to review the plans prepared by Power in order to assist Railway in its approval of such plans, and also a soils expert to advise on soils conditions and proper corrective measures to be taken if necessary. If Power employs

—/8 —

rienced consultants ac   table to Railway to advise an  assist in the design
of such major structures, it is understood that further review by other consul-
ts will not be required by Railway at expense of Power.

c.  Railway shall, with its regular inspection forces, at Power's sole
cost and expense, make all necessary mill and shop inspection of structural
st el, rail and track fastenings, inspections of all timber products, concrete
planks, concrete test cylinders, etc., entering into the work herein covered
by this agreement.   Suitable reports on such inspections will be furnished
Railway and shall be available to Power and Power agrees to accept such inspec-
tion as final and conclusive.

<u>ARTICLE VI</u>

<u>REIMBURSEMENT</u>

Section 1.  Power covenants and agrees that it will, within sixty (60)
days after receipt of bills therefor, pay Railway at rates herein specified
for all materials furnished and services performed by Railway, specified in
Article V to be at the sole cost and expense of Power.  Services performed by
Railway shall include those of Consulting Engineers and Soils experts engaged
by Railway to review plans.

Section 2.  Power will also pay to Railway within sixty (60) days after
operation over the relocated line commences, a sum, in addition to the costs
of supervision and overhead provided for in paragraph d, Section 2, Article V,
representing indirect overhead expense, such as time devoted by corporate offi-
ers, together with other technical and professional staff advisers to such
corporate officers, traveling expenses and other such items difficult of seg-
regation and audit in the aggregate total of $35,000.

Section 3.  Power will also pay to Railway all engineering, auditing and
clerical costs necessarily incurred by Railway in checking plans, revising
their records, preparing bills, and auditing accounts.

Section 4.  Power will also reimburse Railway for any and all labor claims

— 19 —

it may be assessed by reason of contracting, either by Power or Railway, of any work covered by this agreement to which labor organizations may later lay claim. Railway will notify Power of the possibility of such claims and will cooperate with Power in attempting to secure clearance from labor organizations before work is contracted.

## ARTICLE VII
### SALVAGE

It is understood that all salvageable material released by and replaced at sole expense of Power, including ties, will become the property of Power. Power agrees to sell to Railway all salvageable track metal at the prevailing market rate for such track metal classified as re-usable or scrap, as the case may be. Railway may elect to purchase all or any part of salvageable structural steel, signal and communication facilities and any other salvageable materials, and agrees to pay therefor the proper prevailing market rate for such materials classified as re-usable or scrap, as the case may be.

It is also understood the 100% salvageable rail, track metal and turnout material released by the relocation work and replaced with rail, track metal and turnout material furnished at expense of Railway under Section 1a, Article IV, and rail, track metal and turnout material from auxiliary trackage beyond main line turnouts released by the relocation work and replaced with rail, track metal and turnout material furnished at expense of Railway under Section 1b, Article IV, will remain property of Railway.

## ARTICLE VIII
### ACCEPTANCE OF WORK

Section 1. Upon completion of the work covered by this agreement in accordance with the terms hereof, the Chief Engineer of Railway, when so notified, shall inspect the work, and if found in all respects complete in accordance with the plans and specifications, except for final ballast application, he shall accept the same in writing for Railway. If, in his judgment, the work is not complete or in accordance with the plans and specifications, except for final ballast application, he shall so notify Power in writing,

— 20 —

stating wherein the wo. is deficient.   If and when i . the work or any operable portion thereof, is found to be complete, except for final ballast application, by the said Chief Engineer, and he shall have accepted the same in writing for Railway, it shall commence operations over the line or part of line so relocated, reconstructed and altered under this agreement, and cease operations over the portions of the existing line to be abandoned.   It is understood that, due to necessary construction conditions, certain sections of the relocated line will be placed in operation before the project is entirely completed, and that final ballast will not be applied until after the relocated line is placed in regular operation.   It is further understood that acceptance of the completed line is subject to provisions set out elsewhere in this agreement, relating to Additional Construction & Maintenance for stabilization of relocated and altered lines and facilities wherein further corrective measures, as found necessary during a specified operating period, may be required at Power's sole cost and expense to finally complete the project.

Section 2.  It is hereby mutually recognized and agreed, regardless of materials or services furnished for reconstruction by Railway, that ownership of such relocated line rests in Power.   As soon as possible, after commencement of operations over the entire relocated line by Railway, Power shall convey to Railway by proper deed, or deeds, acceptable to Railway, its complete ownership of the relocated line, such deed to be in addition to those conveying rights of way for the relocated line to Railway.   In the event operation over certain sections of the relocated line is found necessary before the entire completion of the relocated line and subsequent operation, Power shall give Railway written permission to operate over such sections, pending final complete operation by Railway and deeding of the relocated line to Railway.

It is understood and agreed that, simultaneously with the deeding of the relocated railroad property by Power to Railway, Railway will transfer, insofar as it may legally do so, all its rights and title in the present railroad property to be abandoned to Power.

21

Section 3.  Railway, execution of this agreement, acceptance as provided for herein, does not waive its rights of recovery for any damages, which may be caused in the future to the railroad line and its facilities, also to its train or other equipment as may be involved in a derailment, together with any and all other loss, costs, suits, damages, and expenses on account of personal injury to or death of any and all persons whomscover, arising out of a negligent rate of drawdown of the pool level of Noxon Rapids reservoir and resulting in failure of roadbed of Railway.

## ARTICLE IX

### ADDITIONAL CONSTRUCTION AND EXTRAORDINARY MAINTENANCE

Section 1.  It is mutually recognized by the parties hereto that conditions, inherent in the work to be performed hereunder and in the construction and operation of the said dam and reservoir, will cause further stabilization or protection of the railroad line as relocated, reconstructed, altered or protected under the terms hereof, to become necessary, following the construction period.  It is also recognized that railroad operation, over the Railway line involved herein during the seasoning period, will impose additional construction and maintenance costs.  These costs may arise on account of caving, sliding, sinking or settling, or because of inundation, overflow, saturation and percolation, including damage to riprapping or protective work in connection therewith, until the seasoning period is complete.  Therefore, Power agrees that it will pay to Railway, as part of the consideration for this agreement, all costs and expense of extraordinary maintenance, including but not limited to lining and surfacing of track, and all costs of additional construction, including but not limited to the costs of restoring roadbed and structures by removal or placing of grading materials and required riprap;  by replacing ballast, culverts or underground drains;  removal of dangerous rocks, trees or other obstructions;  by building and removing temporary tracks around slides and washouts and other protection of tracks, roadbed and structures and the realignment and resurfacing of tracks in connection therewith, all as considered necessary in the reasonable judgment of the Chief Engineer of Railway, which extraordinary maintenance or additional construction is required during a period of time defined as follows:

(a) for that portion of the railroad line as relocated and situated downstream from the Noxon Rapids Dam from the time Railway starts regular operation over the relocated portion of its line until five years after such date;  (b) for that portion of the railroad line as relocated and situated upstream from the Noxon Rapids Dam from the time Railway starts regular operation over the re-located portion of its line until five years after the pool level shall first reach elevation 2331 at the dam;  and (c) for those parts of the line which, although not relocated, are otherwise altered, strengthened, protected, or adversely affected by the reservoir waters from the time such protective works are completed, or adverse effects first experienced, until five years after the pool level shall first reach elevation 2331 at the dam.

The work of such additional construction and maintenance may be performed when and as required, either with Railway's own forces or through responsible contractors employed by it.  Power shall reimburse Railway, as provided herein, within sixty (60) days after receipt of invoices therefor.

Extraordinary maintenance shall consist of the total annual cost of main-tenance on the relocated or protected portion of the railroad line, less the calculated normal annual maintenance estimated and accepted at $25,000 per year.  In the event portions of the relocation are placed in operation before operation of the complete relocation, only a pro rata portion of the normal maintenance exception shall apply in establishing extraordinary maintenance charges for such partial relocation operation.

Section 2.  It is understood that the responsibility of Power for such extraordinary maintenance shall be limited to the relocated portions of the railroad line, plus that part of the existing railroad which, although not re-located, may be otherwise altered, strengthened, or adversely affected by the waters impounded by Noxon Rapids dam.  Power will not be responsible for any maintenance expense on any portion or portions of the existing railroad line which are not subject to or affected by the waters of the Noxon Rapids Hydro-electric Development.

-23-

## ARTICLE X

### LIABILITY

In view of the fact that the work to be performed under the terms of this agreement is primarily for the accommodation and benefit of Power, Power covenants and agrees that it will defend, indemnify, and hold harmless Railway from and against any and all loss, costs, suits, damages, and expenses on account of personal injury to or death of any and all persons whomsoever, including contractors, subcontractors, employees of contractors, and of the parties hereto, and damage to property to whomsoever belonging, which occur prior to the acceptance of the work, as provided in Article VIII, and which in any manner grow out of the performance of the work contemplated by this agreement, regardless of whether or not there is concurring negligence on the part of the Railway Company.  It is understood, however, that Power shall not be liable for accidents and damages in railroad operations occurring on the reconstructed portion of the railroad during the construction period which in no way are caused by the construction operations and are caused entirely by Railway itself.

## ARTICLE XI

This agreement shall inure to the benefits of and shall be binding upon the successors and assigns of the respective parties hereto.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed on the day and year first hereinabove written.

WITNESSES:

A. J. Lindsay
Secretary

WITNESSES:

H. A. Southam

WASHINGTON WATER POWER COMPANY

By _____
Vice-President

NORTHERN PACIFIC RAILWAY COMPANY

By  O. H. Burgess
VICE PRESIDENT

-24-

# Exhibit 4

WHEREAS, in connection with construction of the Noxon Rapids Hydro-electric Development on the Clark Fork River in Sanders County, Montana, by the Washington Water Power Company at an estimated cost of $79,500,000, it is proposed to raise the surface of the waters of the Clark Fork River, making it necessary to protect, relocate, alter and reconstruct that portion of the Railway Company's main line in the vicinity of Noxon, Tuscor and Trout Creek, Montana, and to acquire additional right of way across privately owned land and lands now owned by the United States of America; and

WHEREAS, The President and Chief Engineer have approved the general location of a survey made by the said Power Company of the proposed relocated main track, the location of which is shown in red on the map hereto attached, marked Exhibit "A";

NOW, THEREFORE, RESOLVED, That the President and Chief Engineer of the Company are hereby authorized and directed to alter and relocate at the expense of said Power Company that portion of the mainline tracks across portions of Sections 25, 26 and 27, Township 24 North, Range 31 West; Sections 12, 1, 2 and 3, Township 24 North, Range 32 West; Sections 35, 34, 27, 26, 23, 14, 11, 10, 3 and 4, Township 25 North, Range 32 West; Sections 33, 32, 29, 20, 19 and 18, Township 26 North, Range 32 West; Sections 13, 14, 11, 10 and 9, Township 26 North, Range 33 West, Montana Principal Meridian, Sanders County, Montana, a distance of approximately 19.4 miles, as shown on Exhibit "A".

BE IT FURTHER RESOLVED, That the officers of this Company are authorized to acquire the necessary right of way for said proposed relocated mainline track over and across privately owned and Government owned lands by purchase or condemnation and under the pertinent Acts of Congress of the United States and the regulations of its Department of the Interior, and are further authorized to take any and all actions that may be necessary in connection with the relocation of said proposed mainline track, the acquisition of the right of way therefor, and compliance with the regulations of said Department of the Interior.


C E R T I F I C A T E


I hereby certify that the foregoing preambles and resolutions were passed by the Board of Directors of the Northern Pacific Railway Company at its meeting in Chicago on December 8, 1955.

Dated at St. Paul, Minnesota, December 13, 1955.

Secretary
Northern Pacific Railway Company

(SEAL)



EXHIBIT "A"
N.P. Ry.
Line Changes for Washington Water Power Co.
for Noxon Rapids Hydro-Elect. Development
scale 1"= 4 Miles
Office of Chief Engr.    St. Paul,    Nov. 30, 1955.

# Exhibit 5



# THE WASHINGTON WATER POWER COMPANY

POST OFFICE DRAWER 1445    SPOKANE 10, WASHINGTON

October 24, 1957

GEORGE N. BRUNZELL
VICE PRESIDENT AND
ASSISTANT TO THE PRESIDENT

Mr. C. H. Burgess, Vice President
The Northern Pacific Railway Company
St. Paul, Minnesota

THE WASHINGTON WATER POWER COMPANY
NOXON RAPIDS HYDROELECTRIC DEVELOPMENT
1959 - 600,000 KW INITIAL CAPABILITY
NORTHERN PACIFIC RAILWAY RELOCATION

Dear Mr. Burgess:

In accordance with various provisions included in the Agreement dated July 26, 1955 by and between The Washington Water Power Company and Northern Pacific Railway Company, this letter is written to confirm previous notification given to your Chief Engineer by our Agent, Ebasco Services Incorporated, to the effect that the work covered by the above described Agreement was completed, with certain exceptions which were not of such nature or magnitude as to prevent the operation of trains over the relocated track, on October 11, 1957.

The relocated line between Mile Post 56.55 and Mile Post 73.77, has been used by your freight and passenger trains since 2:30 P.M. of October 16, 1957. It is our understanding that you will have completed the necessary trial operation of this relocated line by October 31, 1957. It is further understood that the inspection of this portion of the line, by the Chief Engineer of Railway, has been completed in accordance with Section 1 of Article VIII of the July 26, 1955 Agreement.

In accordance with said Section 1 of Article VIII, we request that your Chief Engineer accept this portion of the work in writing and advise us upon what date the Northern Pacific Railway will release, for removal of the track, the old line between the above described points.

In accordance with Section 2 of Article VIII, we shall, as soon as possible convey to Railway the ownership of said relocated line. In further accord with Section 2 it is understood that Railway will transfer its rights and title in the abandoned railroad property to The Washington Water Power Company

Mr. C. H. Burgess                    2                    October 24, 1957


That portion of the Railway at Beaver Creek, including the new Bridge #50, between Mile Post 49.17 and Mile Post 51.46 has been in full operation since March 20, 1957.  The above request for written confirmation of acceptance and the interchange of properties, as described above, also applies to this section.

Very truly yours,

George M. Brennyee

XO ms

ENG. DEPT        CONST. DEPT.        ATTORNEYS        RIGHTS OF WAY        SECURED BY

# Exhibit 6

COPY

EBASCO SERVICES
INCORPORATED

*ENGINEERING DEPARTMENT FILE*

P. O. Box 738
Noxon, Montana
October 31, 1957

Mr. J. D. Worthing, Assistant Engineer Construction
Northern Pacific Railway Company
Trout Creek, Montana

THE WASHINGTON WATER POWER COMPANY
NOXON RAPIDS HYDRO ELECTRIC DEVELOPMENT
1959 - 400,000 KW INITIAL CAPABILITY
RAILROAD RELOCATION
REMOVAL OF OLD LINE OF RAILROAD ON LEFT BANK

Dear Mr. Worthing:

This will confirm your telephone conversation of today
that Railway will officially release the left bank track for our
disposal as of November 1, 1957.

Very truly yours,

F. L. Weiss
Project Manager

FLW:jg

cc: Mr. H. R. Peterson, Chief Engineer  NPRR

bc: K M Robinson/G M Brunzell
    L R Gamble
    M L Blair
    K O Strenge
    H K Fairbanks/R A Sutherland
    J R Smith/W B Walker
    F G Schlemmer
    W R Parrott

COPY

# Exhibit 7

# UNITED STATES CODE
# CONGRESSIONAL AND
# ADMINISTRATIVE NEWS

STATE LAW LIBRARY

MAY 1 9 1989

OF MONTANA

## 100th Congress—Second Session
## 1988

Convened January 25, 1988

Adjourned October 22, 1988

# Volume 5

LEGISLATIVE HISTORY:

PUBLIC LAWS 100–418 CONT'D to 100–532

ST. PAUL, MINN.

WEST PUBLISHING CO.

# NATIONAL TRAILS SYSTEM IMPROVEMENTS ACT OF 1988

*P.L. 100–470, see page 102 Stat. 2281*

### DATES OF CONSIDERATION AND PASSAGE

*Senate: July 6, September 19, 1988*

*House: April 19, August 2, 1988*

Senate Report (Energy and Natural Resources Committee)
No. 100–408, June 29, 1988 [To accompany S. 1544]

House Report (Interior and Insular Affairs Committee),
No. 100–572, Apr. 18, 1988 [To accompany H.R. 2641]

Cong. Record Vol. 134 (1988)

*The Senate bill was passed in lieu of the House bill.
The Senate Report is set out below.*

## SENATE REPORT NO. 100–408

[page 1]

The Committee on Energy and Natural Resources to which was referred the bill (S. 1544) to amend the National Trails System Act to provide for cooperation with State and local governments for the improved management of certain Federal lands, and for other purposes, having considered the same, reports favorably thereon with an amendment and recommends that the bill, as amended, do pass.

[page 3]

### PURPOSE OF THE MEASURE

The purpose of S. 1544, as ordered reported, is to further the use of abandoned railroad rights-of-way for recreational trail and conservation purposes.

### BACKGROUND AND NEED

In the second half of the 1800's, Congress passed legislation to encourage the expansion of railroads by offering rights-of-way across federal lands. Initially, during the 1860's, these legislative initiatives involved generous grants of rights-of-way and lands to the great transcontinental railroads. In later years, this approach was discarded and replaced by the 1875 General Railroad Right of Way Act, which permitted railroads to obtain a 200-foot federal right-of-way for running track across public lands. It is estimated

2607

## LEGISLATIVE HISTORY
### SENATE REPORT NO. 100-408

that approximately one-half of the railroad rights-of-way in the United States were federally granted through one of the various 19th century right-of-way statutes.

Prior to 1922, as railroad rights-of-way were abandoned, numerous individual laws were enacted to determine the disposition of the lands within various rights-of-way. In 1922, Congress adopted legislation (43 U.S.C. 912) to providing that upon an abandonment confirmed by court decree or Act of Congress, the federal interest in the right-of-way would become the property of any adjacent landowner whose own title was based on a federal conveyance or from a municipality through which the right-of-way passed, unless a state or local agency included such a right-of-way in a public highway within one year of abandonment.

In addition, Congress has acted on other occasions to promote other public uses of abandoned railroad rights-of-way. In particular, their use for recreation has been recognized and encouraged by the National Trails System Act, the Railroad Revitalization and Regulatory Reform Act, and other laws. More than 55,000 miles of railroad right-of-way have been abandoned since 1975, and the rate of abandonment has been increasing in recent years.

As interest in walking, biking and hiking continues to grow, and pressure for more and better trails has emerged, abandoned railroads have become a growing source of new recreational trails. They are well suited to trail use since they often follow river corridors, traverse coastal plains, cross mountain valleys, and link neighboring towns and valleys. Because the rail lines are already established, constructing a trail from an abandoned railroad is much less costly than building an entirely new trail.

[page 4]

S. 1544 would facilitate such trail development and use by allowing the United States to retain its interest in abandoned rights-of-way and encouraging trail development on these rights-of-way.

## LEGISLATIVE HISTORY

A hearing on S. 1544 was conducted by the Subcommittee on Public Lands, National Parks and Forests on March 3, 1988. The House companion bill, H.R. 2641, passed the House on April 19, 1988.

At the business meeting on May 18, 1988, the Senate Committee on Energy and Natural Resources ordered S. 1544, as amended, favorably reported.

## COMMITTEE RECOMMENDATIONS AND TABULATION OF VOTES

The Senate Committee on Energy and Natural Resources, in open business session on May 18, 1988 by unanimous vote of a quorum present, recommends that the Senate pass S. 1544 if amended, as described herein.

The rollcall vote on reporting the measure was 19 yeas, 0 nays, as follows:

## NATIONAL TRAILS IMPROVEMENTS ACT
P.L. 100-470

| YEAS | NAYS |
|---|---|
| Mr. Johnston | |
| Mr. Bumpers* | |
| Mr. Ford | |
| Mr. Metzenbaum* | |
| Mr. Melcher | |
| Mr. Bradley | |
| Mr. Bingaman | |
| Mr. Wirth | |
| Mr. Fowler | |
| Mr. Conrad | |
| Mr. McClure | |
| Mr. Hatfield* | |
| Mr. Weicker* | |
| Mr. Domenici | |
| Mr. Wallop | |
| Mr. Murkowski | |
| Mr. Nickles | |
| Mr. Hecht | |
| Mr. Evans | |

* Indicates voted by proxy.

## COMMITTEE AMENDMENTS

During the consideration of S. 1544, the Committee adopted an amendment in the nature of a substitute, which makes the bill very similar to the House companion, H.R. 2641. The substitute includes a number of technical and conforming amendments and some substantive changes. A discussion of those substantive differences follows. Additional information on the substitute is included in the "Section-by-Section Analysis" of this report.

[page 5]

### Consideration of other Multiple Uses in addition to Trail Use

The Committee added language to broaden the management options of rights-of-way retained by the United States outside the boundaries of a conservation unit or National Forest. The bill, as introduced, directed the Secretary of the Interior to manage those rights-of-way that he deemed suitable as a public recreational trail or for other recreational purposes. The Committee added language to direct the Secretary to expand the management of such rights-of-way to include other uses that the Secretary determines to be appropriate pursuant to applicable law. Other multiple uses such as roads or utility rights-of-ways may therefore be considered along with the trail or recreational uses.

### Conveyance of Retained Rights-of-Way

The Committee is concerned that the conveyance of reverted rights-of-way which would be authorized by S. 1544 occur only in appropriate circumstances. The Committee therefore added language to allow the Secretary to release and quitclaim retained rights-of-way only "where appropriate". These rights-of-way may have continuing multiple use values, (e.g. utility corridors), which

## LEGISLATIVE HISTORY
### SENATE REPORT NO. 100-408

should be fully examined before the right-of-way is conveyed out of federal ownership. In this regard, the Committee notes that one of the tests for transferring land out of Federal ownership by sale contained in section 203(a)(3) of FLPMA is that "disposal of such tract will serve important public objectives, . . . which cannot be achieved prudently on other than public land, *and which outweigh other public objectives and values. . . ."* (Emphasis added). The Committee believes this standard should be used by the Secretary in determining when it is appropriate to transfer rights-of-way by release and quitclaim pursuant to this section.

### Liability

The Committee understands that the Department of the Interior is concerned that it might be held liable for hazardous conditions or materials which might be found on rights-of-way transferred pursuant to S. 1544. The Committee added language to clarify that any unit of government or other entity receiving title to the surface estate of a right-of-way through release and quitclaim by the Secretary must assume full responsibility for any legal liability which might arise as a result of activities on or conditions of the right-of-way both prior to and after the transfer. The railroad or third parties will, of course, remain liable for their own acts and omissions on the corridor. The Committee expects the Secretary to appropriately condition the release and quitclaim to reflect the Committee's intent in this regard.

The Committee also added language clarifying that, notwithstanding any other provision of law, the United States would be under no duty or obligation to inspect such right-of-way prior to release and quitclaim and would incur no liability with respect to hazardous or unsafe conditions existing at the time of the release or quitclaim.

[page 6]

### Trails Fund

The bill, as introduced, provided for sale of federal rights-of-way which are not appropriate for trails use, with the proceeds being credited to a special revolving fund to finance trail acquisition and development. The Committee has amended the bill to provide that the proceeds from such sales be credited instead to the Land and Water Conservation Fund used in accordance with the Land and Water Conservation Fund Act of 1965.

### Iditarod Historic Trail Advisory Council

The Committee added an additional section to the bill which would extend the Iditarod Historic Trail Advisory Council from ten to twenty years.

### Condemnation Authority

The Committee also added a new section to S. 1544 ensuring that this bill will not grant the Secretary the authority to condemn lands for the purpose of retaining or acquiring any or all of a right-of-way.

## NATIONAL TRAILS IMPROVEMENTS ACT
### P.L. 100-470

The Committee also included a savings clause providing that nothing in the bill would be construed to expand or diminish existing condemnation authorities contained in the National Trails System Act, as amended.

### SECTION-BY-SECTION ANALYSIS

Section 1 provides that this Act may be cited as the "National Trails System Improvements Act of 1988"

Section 2 contains findings of the Congress with respect to the public policy on the use of abandoned railroad rights-of-way for trail purposes.

Section 3 amends section 9 of the National Trails System Act by adding four new subsections.

The first new subsection, subsection (c), provides that in the event of future abandonment of railroad rights-of-way previously acquired by the United States, the United States would retain whatever interest it may have in the abandoned railroad right-of-way.

The second new subsection, subsection (d), would provide for management of the retained federal interests in the affected rights-of-way. Paragraph (1) directs that rights-of-way retained by the United States inside a conservation area or National Forest be managed in accordance with applicable provisions of law relating to those lands.

Paragraph (2) of new subsection (d) provides that retained rights-of-way adjacent to or contiguous with any portion of the public lands would be managed in accordance with the Federal Land Policy and Management Act of 1976 and other applicable provisions of law.

Paragraph (3) of new subsection (d) would provide that portions of retained rights-of-way located outside the boundaries of a conservation system unit or National Forest, and suitable for recreational trail and other public recreation purposes, would be managed for such purposes as well as other uses the Secretary determines to be appropriate pursuant to applicable law.

[page 7]

New subsection (4), paragraph (1), would authorize the Secretary of the Interior, where appropriate, to transfer to a State or local government or qualified entity, for public recreational purposes, the retained federal interests in an abandoned right-of-way located outside the boundaries of a conservation system unit or National Forest. The Secretary would be required to publish a public notice when an application for transfer is made by a State of local government or qualified entity. The paragraph would also specify—that such transfers would be subject to these conditions: (1) a transferred right-of-way would revert to the United States if the recipient attempted to convey or transfer it or if it were used for purposes incompatible with public recreation; (2) such unit or entity shall assume full responsibility for any and all legal liability which might arise with respect to such right-of-way; (3) notwithstanding any other provision of law, the United States would be under no duty or obligation to inspect such right-of-way before transfer and would not incur any legal liability with respect to any hazard or unsafe condition existing on such right-of-way prior to transfer.

NATIONAL TRAILS IMPROVEMENTS ACT
P.L. 100-470

Interior during Subcommittee hearings relating to S. 1544 are set forth below:

[page 9]

DEPARTMENT OF AGRICULTURE
OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20250

April 2 2 1988

Honorable J. Bennett Johnston
Chairman, Committee on Energy
and Natural Resources
United States Senate
Washington, D.C. 20510

Dear Mr. Chairman:

This is in reply to your request for the views of this Department regarding S. 1544, a bill "To amend the National Trails System Act to provide for cooperation with State and local governments in the approved management of certain Federal lands, and for other purposes."

The Department of Agriculture recommends enactment of S. 1544 only if amended to resolve several issues discussed herein. We defer to the Department of the Interior regarding those portions of the bill affecting that Department.

S. 1544 would amend section 9 of the National Trails System Act ("Trails Act") by adding several new subsections. Enactment of S. 1544 would require that any right, title, interest, and estate of the United States in all rights-of-way of the type described in the Act of March 8, 1922, would remain in the United States upon the abandonment or forfeiture of such rights-of-way, except as the rights-of-way would be used for those rights-of-way located within a public highway within 1 year after abandonment.

Abandoned rights-of-way retained by the United States within the boundaries of a National Forest or a conservation unit would be added to that Forest or unit and managed accordingly. A rights-of-way such rights-of-way outside the boundaries of a conservation unit or of a National Forest, but adjacent to or contiguous with any public lands, would be managed by the Secretary of the Interior pursuant to the Federal Land Policy and Management Act of 1976. Under certain conditions, the Secretary of the Interior would be authorized to transfer such lands to a unit of State or local government or to sell any portion of the retained rights-of-way.

S. 1544 would establish a revolving trails development fund, to be known as the Trails Fund. The fund would consist of appropriations made by Congress, funds from the sale of any retained railway rights-of-way, donations, and interest on the fund. The fund would be managed by the Secretary of the Interior for acquisition of new trails or conservation by reconstruction of existing trails. The Secretary of the Interior would be authorized to make loans from the fund to qualifying organizations and governmental units for trail purposes.

We strongly support the concept of converting abandoned railroad rights-of-way to trails where such adaptive reuse is appropriate. We also support use of S. 1544 would probably do more to continue land titles than to expand the national network of trails.

[page 10]

Honorable J. Bennett Johnston

2

This bill pertains to residual property rights of the United States. Enactment could affect thousands of rights-of-way conveyances made under a variety of statutory authorities and require complicated interpretations of public land law pertaining to residual rights of the United States.

---

LEGISLATIVE HISTORY
SENATE REPORT NO. 100-408

Paragraph (2) of new subsection(e) would authorize the Secretary of the Interior to dispose of rights-of-way outside of a conservation system unit or National Forest and not adjacent to or contiguous with any portion of the public lands. Prior to such sale, the Secretary would be required to make a determination pursuant to section 203 of the Federal Land Policy and Management Act of 1976 as to the suitability for sale, and would also be required to provide appropriate opportunities for a State, unit of local government or qualified entity to seek to obtain the right-of-way for public recreation purposes through the mechanism provided by paragraph (1), and in accordance with its requirements.

The proceeds from such sales would be deposited in the Land and Water Conservation Fund (LWCF) as provided for in section 2 of the LWCF Act of 1965. The Secretary would be required to make a yearly report to the Congress as to the proceeds realized from such sales.

New subsection (f) would define relevant terms used in S. 1544.

Section 4 amends Section 5 of the National Trails System Act to extend the life of the Iditarod Historic Trail Advisory Council from ten to twenty years from the date of its establishment.

Section 5 ensures that nothing in the bill should be construed to authorize the Secretary to use condemnation to retain or acquire all or any portion of a right-of-way described in the bill. A savings Clause clarifies that nothing in this bill should be construed to expand existing condemnation authority contained in the National Trails System Act, as amended.

[page 8]

COST AND BUDGETARY CONSIDERATIONS

The Congressional Budget Office estimate of the costs of this measure has been requested but was not received at the time the report was filed. When the report is available, the Chairman will request it to be printed in the Congressional Record for the advice of the Senate.

REGULATORY IMPACT EVALUATION

In compliance with paragraph 11(b) of Rule XXVI of the Standing Rules of the Senate, the Committee makes the following evaluation of the regulatory impact which would be incurred in carrying out S. 1544. The bill is not a regulatory measure in the sense of imposing Government-established standards or significant economic responsibilities on private individuals and businesses.

No personal information would be collected in administering the program. Therefore, there would be no impact of personal privacy.

Little, if any, additional paperwork would result from the enactment of S. 1544, as reported.

EXECUTIVE COMMUNICATIONS

The pertinent legislative report received by the Committee from the Department of Agriculture setting forth executive agency recommendations and testimony received by the Department of the

## NATIONAL TRAILS IMPROVEMENTS ACT

P.L. 100-470

[page 12]

STATEMENT OF WILLIAM PENN MOTT, JR., DIRECTOR, NATIONAL PARK SERVICE, DEPARTMENT OF THE INTERIOR, BEFORE THE SUBCOMMITTEE ON PUBLIC LANDS, NATIONAL PARKS AND FORESTS, SENATE COMMITTEE ON ENERGY AND NATURAL RESOURCES, CONCERNING S. 1544, THE PROPOSED NATIONAL TRAILS SYSTEM IMPROVEMENTS ACT OF 1987.

MARCH 3, 1988

Mr. Chairman, I appreciate the opportunity to provide your Subcommittee with the views of the Department of the Interior on S. 1544, the proposed National Trails System Improvements Act of 1987.

We support the intent of the bill, to encourage State and local governments to acquire and develop trails for recreation and conservation purposes, but we cannot recommend enactment of the bill in its present form. It would be premature for us to support such a measure without a comprehensive understanding of all the legal issues involved, and there are many which would be unresolved under S. 1544. Moreover, we do not agree with the findings of the bill outlining a strong Federal role in providing funding.

S. 1544 would amend the National Trails System Act by adding four subsections to section 9. These provisions deal with abandoned or forfeited railroad rights-of-way. Under existing law, if it reverts to the U.S., an abandoned or forfeited right-of-way is conveyed to the owner of the land traversed by the right-of-way or to a city if the right-of-way is within a municipality. Under S. 1544, whatever right-of-way interest that may revert to the U.S. would remain in the Federal Government to be managed or disposed of as follows:

-- If the right-of-way is within the National Park System, National Wildlife Refuge System, National Trails System, National Forest System, or Wild and Scenic Rivers System, it becomes part of that system and is managed accordingly.

[page 13]

-- If the right-of-way is not within one of the conservation systems but is nevertheless adjacent to public lands managed by the Bureau of Land Management, then it shall be managed by BLM in accordance with FLPMA.

-- If the right-of-way is outside of a conservation system unit, it could be transferred to qualified non-Federal entities for recreational purposes, or, if not adjacent to

2615

---

## LEGISLATIVE HISTORY
### SENATE REPORT NO. 100-408

Section 3 assures that the United States has some remaining residual interest in certain railway rights-of-way which could be converted to recreation trail uses. That may or may not be the case.

Upon abandonment, rights-of-way across National Forest System lands that were granted under the Act of March 3, 1875 (43 U.S.C. 934), generally vest to the United States upon abandonment. Rights-of-way granted under other authorities must be individually examined to determine the status of the right-of-way if the railway is abandoned.

In our experience and from review of selected railroad grants affecting National Forests, it appears that the United States has residual property interests if any, in rights-of-way over private land within National Forest boundaries. Under current law (43 U.S.C. 912), if the United States has some residual property rights in abandoned rights-of-way over private land, those rights would pass to the owner of the underlying land, subject to certain State rights to use the right-of-way for roads.

The proposed bill would implicitly repeal 43 U.S.C. 912, thereby reversing the public policy set in 1922 with regard to abandoned rights-of-way. It is unclear what affect this would have on rights already vested under section 912. It is also unclear what the effects would be on land titles affected by rights-of-way. Section 912 was enacted, in part, to provide a cost effective and expeditious means of clearing title to patented land. If the purpose for dealing with abandoned rights-of-way is changed, it ought to be done by direct amendment of section 912 with full consideration of the impacts on land titles and the potential taking issues.

S. 1544 is inconsistent with the provisions of most State laws which provide that rights in an abandoned easement merge with the underlying fee title. Adjacent property owners have an expectation of being the successful claims on rights in abandoned rights-of-way. When dealing with potential clouds on private land titles, we see a compelling reason to be as consistent as possible with State property laws. This bill does not do that. We are concerned that enactment of this bill will complicate land titles by interposing the Federal Government in claims to land long ago patented from the public domain. This will inevitably lead to litigation.

We do not support the creation of a Trails Fund. This fund would probably cost more to administer than any benefits it would generate.

[page 11]

Honorable J. Bennett Johnston

We again would like to emphasize that we support the concept of "trails to trails." However, the concerns we have raised must be appropriately addressed in any bill that we would support. We would be pleased to work with the Committee in an effort to meet that need.

The Office of Management and Budget advises that there is no objection to the presentation of this report from the standpoint of the Administration's program.

Sincerely,

[signature]

RICHARD E. LYNG
Secretary

2614

# NATIONAL TRAILS IMPROVEMENTS ACT
### P.L. 100-470

dimension of the opportunities or liabilities such rights-of-way represent. Such surveys should be required before we can undertake to support S. 1544, and they would require close coordination with other Federal interests, State and local governments, and private property owners, including the railroads themselves. We would also encourage private groups to assemble data on candidate areas.

In addition, and more seriously, there are several outstanding legal issues related to the proposed assertion by the Federal Government to reclaim title to some of these rights-of-way. Although we are certainly willing to release whatever interest the Federal Government may have if any, in the surface rights to such property for the purposes envisioned by S. 1544, it is unclear what these rights may be. Our Departmental Solicitor's office has been studying this question, and the results appear to be mixed.

In some jurisdictions, the right-of-way has been construed as creating a type of limited fee title for the property owner, thus

3

[page 15]

leaving some interest in the original grantor (the Federal Government), and adjacent property owners could not expect that they would have ownership rights to the abandoned right-of-way. In other jurisdictions, however, it has been determined that the right-of-way is simply an easement over land owned by the underlying property owner. In these cases, the Federal Government retains no right to assert title to the property unless it is on Federal land. The right-of-way would no longer exist, and the underlying property owner would no longer carry this burden on his property. Therefore, upon abandonment, such property would normally revert to that property owner. Many adjacent property owners evidently have past assurances from the Federal Government that the right-of-way is just an easement, and the property belongs to them. The 1922 Act is vague in this regard.

If S. 1544 were enacted, we are concerned, therefore, that the Federal Government could be placed in the position of asserting title to that which it no longer owns, thus creating an issue of a potential taking by the Federal Government of private property. We see the possibility of numerous law suits over this very matter, and that is one reason we believe these determinations are best left to State and local governments to resolve. More-

# LEGISLATIVE HISTORY
### SENATE REPORT NO. 100-408

BLM lands, sold with the proceeds deposited into a new fund in the Treasury, the Trails Fund.

We note that other federally-managed areas such as Bureau of Reclamation withdrawals, military reservations, and Indian lands held in trust by the United States are for covered by the legislation.

Section 4 of the bill would establish the Trails Fund, to consist of initial appropriations of $500,000 in fiscal years 1988 and 1989, together with proceeds from right-of-way sales, donations, and interest. The fund would be available, without appropriation, for acquisition and construction of trails and for loans to states, local governments, and qualified private organizations. The loans may be interest-free.

The bill further requires an annual report to the legislative Committees of Congress, and it authorizes appropriations totalling $1 million over 2 years for the Trails Fund.

Mr. Chairman, we believe that trails and trail-related activities represent excellent outdoor recreation opportunities for America's citizens. Accordingly, we support the initial finding of the bill related to encouraging State and local governments to establish additional trail opportunities, as well as the intent of the provision of the bill that would effectively repeal 43 U.S.C. 912. Apparently, the intent of this last provision is to

2

[page 14]

ensure that any Federal interests in abandoned railroad rights-of-way would remain in Federal ownership unless and until a conscious decision is made to transfer or sell such interests for recreational use. We estimate that approximately 30,000 miles of public land rights-of-way were granted to the railroads in the 1800's, and we share the belief of the bill's sponsors that much of this mileage could be converted to trail use at such time as it may be abandoned.

There are, however, several problems with the bill that make it seriously flawed.

We have no specific data, for example, on what rights-of-way might become available or even how much has been abandoned. We believe that further analyses and surveys would determine the

## LEGISLATIVE HISTORY
### SENATE REPORT NO. 100-408

over, we believe that the State and local governments would be in a far better position than we are to negotiate for such recreational use.

We therefore recommend that section 3 of the bill be drawn to amend the Act of May 8, 1922, 43 U.S.C. 912, rather than that section 9 of the National Trails System Act. Also, by separate letter, we would like to offer several other technical amendments to the bill, especially section 3, to address the problems that were raised during our review of the measure. We question, for example, the need for additional authority to transfer or sell any Federal property interests that may exist.

[page 16]

We believe that Congress should also consider the liability issue, not treated in S. 1544, if Federal rights-of-way are conveyed to a state or other entity subject to a reversionary clause. Under section 8(d) of the Trails Act, which deals with interim use of rights-of-way for trails, the transferee must assume all tort liability. A similar provision should be considered for transfer of Federal interests. Consideration could also be given to requiring a railroad to remove hazards, including toxic wastes, following a decision to abandon. This would also provide assurance that hazardous products and materials would not automatically be included in a federally-managed area, with consequent financial exposure, under the terms of the bill.

Finally, Mr. Chairman, we oppose a new Federal loan program which would require increased appropriations and would earmark receipts from Federal property sales to the new Trails Fund to be created under the bill. This would undercut the ability of the Congress and the Administration to make rational resource allocations from the amounts available to them. Moreover, this would disconnect the need for funding state and local trail programs, an activity which is not a Federal responsibility, from the level of funding provided. We also note that the previously cited question of ownership could also call into question a source of Trail Fund monies, since the Federal Government cannot sell that which it does not own.

In summary, Mr. Chairman, we have tried to find a way to support this bill because we strongly believe in its goals, but without a

## NATIONAL TRAILS IMPROVEMENTS ACT
### P.L. 100-470

resolution of these underlying legal questions and as long as the proposal for Federal funding remains, we cannot support S. 1544.

This concludes my prepared testimony, Mr. Chairman. I would be pleased to respond to any questions you may have.

# Exhibit 8

Cause No. 6262

DAVID S. BENNETT,

    Plaintiff,

-vs-

UNITED STATES, SANDERS COUNTY,
a Quasi-Municipal Corporation
of the State of Montana,
SAMUEL C. MOTLEY, E. M. MOTLEY,
WILLIAM C. WETZSTEON, EMMA
WETZSTEON, CHAS. BECHER,
HOWARD T. HAVILAND, BERNICE
J. HAVILAND, WASHINGTON
WATER POWER COMPANY, a
Washington Corporation, RAY
B. DEY, MILDRED DEY, CAROL
B. ERENSEL, MEL L. FAY,
BURLINGTON NORTHERN INC.,
NORTHERN PACIFIC RAILWAY
COMPANY, and all unknown heirs
and devisees of any defendant
who may be deceased, and any
and all other persons unknown,
claiming or who might claim
any right, title, interest or
estate in, or lien or encum-
brance upon the real property
described in the Complaint,
or any thereof, adverse to
the Plaintiffs ownership or
any cloud upon Plaintiff's
title thereto, whether such
claim or possible claim be
present or contingent, in-
cluding any claim or possible
claim of dower, inchoate or
accrued,

    Defendants.

COMPLAINT

---

COMES NOW, the Plaintiff, and for his cause of action against the
above named and un-named, known and unknown Defendants, alleges:

    I.

   That Plaintiff and MEL L. FAY were purchasers under a Contract
for the purchase of real property dated the 19th day of May, 1973,
running from CAROL B. ERENSEL to them, pertaining to the following
described real property, lying, being and situate in the County of

-1-

Sanders, State of Montana, to-wit:

That part of the Southeast quarter of the Northwest quarter and the Northeast quarter of the Southwest quarter, lying South and West of the County Road in Section 12, Township 24 North, Range 32 West, M.P.M., containing 43 acres, more or less.

II.

That on or about April 4, 1979, Plaintiff became the sole pur-chaser of said property, by virtue of an Assignment from MEL L. FAY to DAVID S. BENNETT, as evidenced by Notice of Purchaser's Interest dated April 4, 1979, and recorded June 12, 1979, in Book 8 of Contracts, at Page 989, Sanders County Records.

III.

That the above described real property has been owned and occu-pied by the Plaintiff for a period in excess of five (5) continuous years immediately preceeding the filing of this action, subject to seller's equity under said Contract for sale of real property, wherein CAROL B. ERENSEL is named as Seller and DAVID S. BENNETT and MEL L. FAY are named as Buyers, dated May 19, 1973, as evidenced by Notice of Purchaser's Interest recorded May 31, 1973, in Book 5 of Contracts, at Page 903, Sanders County Records; that during all of said occupancy by Plaintiff, all taxes and assessments levied upon the said lands were paid by him; that said Plaintiff occupied said land and held the same under color of title.

IV.

That the legal description of said real property includes lands which were originally granted to the NORTHERN PACIFIC RAILWAY COMPANY, pursuant to Act of Congress, July 2, 1864; that the NORTHERN PACIFIC RAILWAY COMPANY, now BURLINGTON NORTHERN, INC., has abandoned the right-of-way affecting the above described real property; by virtue of the relocation of its railroad track and said land has not been used for any railroad purpose since on or about 1954.

V.

That on or about March 26, 1914, said lands which are the subject

-2-

matter of this action, together with others, were granted to SAMUEL
C. MOTLEY by a Patent from the UNITED STATES OF AMERICA, dated
March 26, 1914, and recorded May 7, 1914 in Book 20 of Deeds, at Page
296, Sanders County Records; that thereafter, SAMUEL C. MOTLEY, a
married man, and his wife, E. M. MOTLEY, transferred said lands,
together with others, to WILLIAM C. WETZSTEON by Warranty Deed dated
July 14, 1914, and recorded July 16, 1914, in Book 22 of Deeds, at
Page 219, Sanders County Records; that thereafter the subject property
and other lands were transferred by WILLIAM C. WETZSTEON and EMMA
WETZSTEON, his wife, to CHAS. BECHER, by Warranty Deed dated November 10,
1921, and recorded November 14, 1921, in Book 26 of Deeds, at Page 353,
Sanders County Records, which said Warranty Deed excepted the
"...Wright of Way of the Northern Pacific Railrode, (sic)"; that
thereafter CHAS. BECHER transferred said lands, together with other
lands, to HOWARD T. HAVILAND and BERNICE J. HAVILAND, by Warranty Deed
dated September 28, 1953, and recorded October 6, 1953, in Book 59 of
Deeds, at Page 475, Sanders County Records, which said Deed excepted,
"...the right of way of the Northern Pacific Railway Company."; that
thereafter HOWARD T. HAVILAND and BERNICE J. HAVILAND, husband and
wife, transferred said lands, together with other lands, to THE
WASHINGTON WATER POWER COMPANY, a Corporation, by Warranty Deed dated
Marcy 30, 1956 and recorded April 18, 1956, in Book 64 of Deeds, at
Page 389, Sanders County Records, which said Warranty Deed excepted,
"...rights-of-way of the Northern Pacific Railway Co., said rights-
of-way including, in addition to the original right-of-way, a 200 foot
right-of-way through the East half of Section 12, as described in
Deeds recorded in Book 15 Deeds page 22, and Book 11 Deeds, page 464,
records of Sanders County; and all land between the original right-
of-way and a line 100 feet Northerly from the new mainline, as described
in deeds recorded in Book 15 Deeds, page 39 and page 236, records of
Sanders County."; that thereafter THE WASHINGTON WATER POWER COMPANY,
a Corporation, transferred said lands, together with other lands, to

RAY B. DEY and MILDRED DEY, husband and wife, by Warranty Deed, dated September 9, 1960, and recorded October 25, 1968, in Book 83 of Deeds at Page 201, Sanders County Records, which said Deed excepts, "...that portion of said Section 12 lying 200 feet each side of the original mainline track of the Northern Pacific Railway, but now removed; and also except that portion of said Section 12 which is Northern Pacific Railway right of way as now operated...." and further reserving to grantor, "....a 100 foot right of way easement being 50 feet on each side of the center line of the electric transmission line traversing said property; said easement being for the purpose of owning, operating, maintaining and replacing electric lines, poles and related facilities, together with the right of ingress and egress."; that thereafter RAY B. DEY and MILDRED DEY, husband and wife, transferred said lands to CAROL B. BRENSEL, an unmarried woman, by Warranty Deed dated October 14, 1970, and recorded November 9, 1978, in Book 96 of Deeds, at Page 176, Sanders County Records, which said Deed excepted, "...easements and rights of way apparent or of record."

VI.

The Plaintiff alleges that all owners and purchasers of record in chain of title to said real property described in Paragraph I above, from commencement of ownership by DAVID S. BENNETT and MEL L. FAY, by virtue of Notice of Purchaser's Interest recorded May 31, 1973, until the present, held, owned and occupied the subject property openly, notoriously and in a manner hostile to the title of all Defendants, named and un-named, known and unknown, and that during such time the ownership of the various named owners of record, when tacked, exceeds six (6) years continuous adverse possession; that during such period of time, all taxes and assessments against said real property were duly paid by those persons appearing of record who were purchasing said property, commencing with the recording of said Notice of Purchaser's Interest and until the present.

//

-4-

VII.

That the Plaintiff herein has held and does now hold said property under color of title, that possession has been in excess of the statutory period required, that all taxes have been duly paid and that the Plaintiff herein is entitled to a Decree quieting title in said real property, as described in Paragraph I above, in the Plaintiff, subject to the seller's equity interest of CAROL B. ERENSEL, under that certain Contract for sale of real property, recorded May 31, 1973, in Book 5 of Contracts, at Page 903, records of Sanders County, and subject to the transmission line reservation by Washington Water Power Co., in the Deed recorded in Book 83, at Page 201, Sanders County Records.

VIII.

That the Above named Defendants, and all Defendants unknown, and each and all of them have, may have or claim to have, or may claim to have some right, title, interest, claim or possible claim, in, to or upon said lands hereinabove described in Paragraph I, or to parts and parcels thereof, which are adverse to the Plaintiff's right in title, but which said interest or pretended claims are without any foundation whatever, and now constitute a cloud upon the Plaintiff's title; and that any right, title, claim or interest that Defendants have or claim to have in or to said lands and premises, or any parts thereof, is subject to and inferior to the right and title of the Plaintiff herein, and by reason thereof, the Plaintiff is now the lawful owner and holder of said lands and premises, subject only to the seller's equity interest of CAROL B. ERENSEL, under that certain Contract for sale and purchase of real property, recorded May 31, 1973, in Book 5 of Contracts, at Page 903, records of Sanders County, and to the transmission line reservation by WASHINGTON WATER POWER CO., in the Deed recorded in Book 83, at Page 201, Sanders County Records.

IX.

That the Plaintiff has joined as known Defendants all persons

1   known to him claiming or who might claim any right, title, estate or
2   interest in or lien or encumbrance upon the lands above described,
3   or any part or parcel thereof, adverse to the Plaintiff's ownership
4   or any cloud upon the Plaintiff's title thereto, whether such claim
5   be present or contingent, including any claim or possible claim of
6   dower, inchoate or accrued, but that there are or may be other persons
7   unknown who are claiming or who might claim an interest or estate in
8   said lands or some part or parcel thereof.

9                                X.

10      That this action is brought pursuant to the provisions of
11  Chapter 28, Title 70, M.C.A., 1979, as amended, to quiet title in
12  the Plaintiff, subject to the seller's equity interest of CAROL B.
13  ERENSEL, under that certain Contract for sale and purchase of land
14  recorded May 31, 1973, in Book of Contracts, at Page 903, records of
15  Sanders County, and subject to the transmission line reservation by
16  WASHINGTON WATER POWER CO., in the Deed recorded in Book 83, at Page
17  201, Sanders County Records.

18      WHEREFORE, Plaintiff prays Judgment against the within named and
19  un-named, known and unknown Defendants, as follows:

20      1.  That the said Defendants, and each of them, and all and every
21  person or persons, firm or firms, corporation or corporations, and all
22  other persons unknown, claiming or who might claim any right, title,
23  estate or claim in or lien or encumbrance upon the real property
24  described in Paragraph I of this Complaint, or any part or parcel
25  thereof, whether such claim or possible claim be present or contingent,
26  and including any claim or possible claim of dower, inchoate or accrued,
27  adverse to the Plaintiff herein, or which may be a cloud upon Plaintiff's
28  title to said lands, be required to set forth the nature of his, her,
29  their or its claim or claims, and that all adverse claims of said
30  Defendants, and all other persons, firm or firms, corporation or
31  corporations, known or unknown, claiming or to claim said land and
32  premises or any part thereof, or any right, title, interest, estate,

-6-

lien or claim therein, thereto or thereon, by said Defendants, bu ent forth to be determined by Decree of this Court;

2. That by Decree of this Court, it be declared and adjudged that none of the Defendants herein or any person or persons whomsoever, known or unknown, save only the Plaintiff herein, have any right, title, estate, lien or claim in, to or upon the lands and premises hereinbefore described, or any part or parcels thereof, and that the Plaintiff has good, complete, perfect and valid title to the whole thereof, subject to the seller's equity interest of CAROL B. ERENSEL, under that certain Contract for sale and purchase of real property, recorded May 31, 1973, in Book 5 of Contracts, at Page 903, records of Sanders County, and subject to the transmission line reservation by WASHINGTON WATER POWER CO., in the Deed recorded in Book 83, at Page 201, Sanders County Records;

3. That the said Defendants and each of them and all and every person or persons whomsoever, known or unknown, save and except the Plaintiff herein, be forever barred and enjoined from asserting any claim or claims of any kind or nature whatsoever in, to or upon the lands and premises herein described or to any part or parcel thereof, which may be in any matter adverse to the Plaintiff herein or to his grantees, except as to the seller's equity interest of CAROL B. ERENSEL, under that certain Contract for sale and purchase of real pro rty recorded May 31, 1973, in Book 5 of Contracts, at Page 903, records of Sanders County, and except as to the transmission line reservation by WASHINGTON WATER POWER CO., in the Deed recorded in Book 83, at Page 201, Sanders County Records.

4. For such other and further relief as to the Court may seem meet and just in the premises.

> CLAUDE I. BURLINGAME
> P.O. Box 835
> Plains, Montana 59859
> Attorney for the Plaintiff

-7-

STATE OF MONTANA )
County of Sanders ) ss.

DAVID B. BENNETT, of lawful age, being first duly sworn, upon oath, deposes and says:

That he is the plaintiff named in the above and foregoing cause of action; that he has read the above and foregoing Complaint and knows the contents thereof; and that the matters and things therein set forth and contained are true to the best of his knowledge.

DAVID B. BENNETT

SUBSCRIBED and sworn to before me this ___ day of _____ 1980.

Notary Public for the State of Montana
Residing at _____
My Commission Expires: _____

# Exhibit 9

Timothy M. Bechtold
Bechtold Law Firm, PLLC
317 East Spruce Street
P.O. Box 7051
Missoula, MT 59807-7051
406-721-1435
406-830-3085 (fax)
tim@bechtoldlaw.net

Attorneys for Estate of Glowdena B. Finnigan

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | | |
|---|---|---|
| **ESTATE OF GLOWDENA B. FINNIGAN,** | ) ) ) | **CV 18-109-M-DLC-JCL** |
| Plaintiff, | ) ) | **DECLARATION OF CLAUDE I. BURLINGAME** |
| vs. | ) ) ) | |
| **UNITED STATES OF AMERICA,** | ) ) ) | |
| Defendant | ) | |

Pursuant to 28 USC §1746, I, Claude I. Burlingame, declare as follows:

  1.  I am an attorney admitted to practice law in the State of Montana.

Since being admitted in 1974, I have practiced real estate, business, and probate

law in Thompson Falls, Montana, which is located in Sanders County.  In that

capacity I represented David S. Bennett in the matter referred to in this case as the

Bennett Action and the Noxon Rural Fire District in the matter referred to as the Noxon Fire Action. I am also the attorney probating the Estate of Glowdena B. Finnigan, which holds title to the Finnigan Property on behalf of the four individual heirs of the Estate.

2.    The 1950s abandonment of railroad right of way and relocation of railroad track alleged, decreed, and confirmed in the Bennett Action is the same abandonment of the right of way and relocation of railroad track discussed in the *Avista* case and involved in this case as to the Finnigan Property.

3.    In the Bennett Action, the exception for mineral rights reserved by the United States was provided in the Bennett Decree because it was a reservation contained in the original federal patent for the Bennett Property. There is no such reservation in the patent for the Finnigan Property.

4.    The map attached as Ex. 2 to Plaintiff's Statement of Undisputed Facts was prepared under my supervision and with my participation. The map shows the location of the abandoned right of way on the south side of the Clark Fork River; the location of several parcels of private property that are traversed by the abandoned right of way; and the location of the relocated rail line on the north side of the Clark Fork River. I have personal knowledge of these matters and they are accurately depicted in the Ex. 2 map.


I declare the foregoing is true and correct under penalty of perjury.

Dated this ___17th___ day of January, 2019.

_____

Claude I. Burlingame

# Exhibit 10

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT
OF THE STATE OF MONTANA
IN AND FOR THE COUNTY OF SANDERS

------------------------------------------

DAVID S. BENNETT,                              :

              Plaintiff,                       :

      vs.                                      :          Cause No. 6262 - 72

UNITED STATES, SANDERS COUNTY, a               :
quasi-municipal corporation of
the State of Montana, SAMUEL C.                :
MOTLEY, E. M. MOTLEY, WILLIAM A.
WETZSTEON, EMMA WETZSTEON, CHAS.               :
BECHER, HOWARD T. HAVILAND,
BERNICE J. HAVILAND, WASHINGTON                :          DISCLAIMER OF INTEREST
WATER POWER COMPANY, a Washington
corporation, RAY B. DEY, MILDRED               :
DEY, CAROL B. ERENSEL, MEL L. FAY,
BURLINGTON NORTHERN, INC.,                     :
NORTHERN PACIFIC RAILWAY COMPANY;
and all unknown heirs and devisees             :
of any defendant who may be
deceased, and any and all other                :
persons unknown, claiming or who
might claim any right, title,                  :
interest or estate in, or lien
or encumbrance upon the real                   :
property described in the
Complaint, or any thereof, adverse             :
to the plaintiff's ownership or
any cloud upon plaintiff's title               :
thereto, whether such claim or
possible claim be present or                   :
contingent, including any claim
or possible claim of dower,                    :
inchoate or accrued,
                                               :
              Defendants.

------------------------------------------

      COMES NOW Allen R. McKenzie, Assistant United States

Attorney for the District of Montana, attorney for defendant

United States, and disclaims any interest on the part of the

United States of America for the reason that the lands involved

in the above action are all privately owned and the United States

has no interest in this action.

      Dated this _21_ day of May, 1980.

                              ROBERT T. O'LEARY
                              United States Attorney for the
                              District of Montana

# Exhibit 11

N.  9 . .335

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE

STATE OF MONTANA, IN AND FOR THE COUNTY OF SANDERS

Cause No. 6262 - 28

| | |
|---|---|
| DAVID S. BENNETT, | ) |
| Plaintiff, | ) |
| -vs- | ) |
| UNITED STATES; SANDERS COUNTY, a Quasi-Municipal Corporation of the State of Montana; SAMUEL C. MOTLEY; E.M. MOTLEY; WILLIAM C. WETZSTEON; EMMA WETZSTEON; CHAS. BECHER; HOWARD T. HAVILAND; BERNICE J. HAVILAND; WASHINGTON WATER POWER COMPANY, a Washington corporation; RAY B. DEY; MILDRED DEY; CAROL B. ERENSEL; MEL L. FAY; BURLINGTON NORTHERN, INC.; NORTHERN PACIFIC RAILWAY COMPANY; and all unknown heirs and devisees of any defendant who may be deceased, and any and all other persons unknown, claiming or who might claim any right, title, interest or estate in, or lien or encumbrance uopn the real property described in the Complaint, or any thereof, adverse to the Plaintiff's ownership or any cloud upon Plaintiff's title thereto, whether such claim or possible claim be present or contingent, including any claim or possible claim of dower, inchoate or accrued, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

FILED Nov 25 19 80

COUNTY CLERK OF COURT

by Carol Thomas DEPUTY

JUDGMENT AND DECREE

## JUDGMENT AND DECREE

This action now duly coming on for hearing, and due proof having

been made of the service of summons and complaint in this action upon

all the defendants as provided by law and all of said defendants having

either filed a disclaimer, a stipulation for entry of default, or not

having filed any appearance, answer or responsive pleading within the

been made or filed, and the plaintiff having filed herein an affidavit
showing, to the satisfaction of the court, that none of the defendants
are in the Military Service; (a) as a member of the Army of the United
States, or the United States Navy, or the Marine Corps, or the Coast
Guard, or an officer of the Public Health Service detailed by proper
authority for duty either with the Army or Navy; or (b) in training or
being educated under the supervision of the United States preliminary
to induction into the Military Service thereof; nor are defendants
infants or incompetent persons.

And the default of the defendants having been entered herein, and
upon plaintiff's application for entry of judgment, and the cause duly
coming on for hearing, and the court having considered the evidence
and law,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED  that the allegations
of the Complaint are true, and plaintiff is entitled to judgment as
demanded in the Complaint subject to sellers equity interest of CAROL
B.ERENSEL under that certain contract for sale and purchase of real
property,  recorded May 31, 1973, in Book 5 of Contracts, at Page 903,
Records of Sanders County, the transmission line right-of-way and all
other rights reserved by Washington Water Power Company in the deed
recorded in Book 83 at Page 201, Sanders County Record, the sixty (60)
foot right-of-way easement for the County road now held by Sanders
County, as the same appears on Certificate of Survey No. 115, on file
in the office of the Sanders County Clerk and recorder, Thompson Falls,
Montana, and the reservation of mineral rights by the United States
Government in, on and under the abandoned railroad right-of-way travers-
ing the said property; and plaintiff is now and, at all times concerned,
has been the owner and in posession of the real property in Sanders
County, Montana, subject to the above four exceptions, which said land
is described as follows:

9  :335

That part of the Southeast quarter of the Northwest
quarter and the Northeast quarter of the Southwest
quarter, lying South and West of the County Road in
Section 12, Township 24 North, Range 32 West, M.P.M.,
containing 43 acres more or less.

And the defendants, and each of them, have no right, title, estate or

interest in, or lien or encumbrance upon said real property, and the

title of the plaintiff in and to all of said real property is quieted

and the clouds cast thereon by the claims or possible claims of the

defendants are removed, and defendants are hereby enjoined from assert-

ing any right, title, estate or interest in or lien or encumbrance

upon said real property adverse to plaintiff's title, except for the

four exceptions hereinabove set forth.

Done in open Court, the 25th day, of November, 1980.

_____
District Judge

# Exhibit 12

IN THE DISTRICT COURT OF THE TWENTIETH JUDICIAL DISTRICT
OF THE STATE OF MONTANA IN AND FOR THE COUNTY OF SANDERS

No. LV-85-37

RICHARD OLSON and MARY E. OLSON,                    FILED ____ 5 7 19 __

                        Plaintiffs,                 _____

    -vs-                                            BY _____
                                                              DEPUTY

1.  COUNTY OF SANDERS, a political subdivision; and

2.  BURLINGTON NORTHERN RAILROAD, successor to
    NORTHERN PACIFIC RAILWAY COMPANY; and

3.  FRED L. ROWE and his wife, if any, and the heirs
    and devisees of Fred L. Rowe and the wife of Fred
    L. Rowe, if any; and

4.  All other persons, unknown, claiming or who might
    claim any right, title, estate, or interest in or
    lien or encumbrance upon the real property described
    in the Complaint adverse to Plaintiffs' ownership or
    any cloud upon Plaintiffs' title thereto, whether
    such claim or possible claim be present or contingent,

                        Defendants.

------------------------------------------------------------

                        COMPLAINT

------------                ------------------------------------

    PLAINT_ _ for their claim state:

    1.  Plaintiffs are the owners of a parcel of real
property in Sanders County, Montana, more particularly
described as follows:

        That po__ion of the Northeast quarter of the
        Northea_ quarter (NE1/4NE1/4) of Section 30,
        Township 26 North, Range 32 West, M.P.M.,
        Sanders County, Montana, described as follows:
        Commenc_ g at the Northeast corner of said
        Section _0, said point being the true point of
        beginni_ ; thence S.0°04'E. along the east
        line of said Section 30 a distance of 223.32
        feet to he northeasterly right-of-way of an
        existin_ county road; thence N.45°48'W. along
        said ri_ t-of-way 321.67 feet to the north
        line of said Section 30; thence S. 89°46'E.
        along s_ d north line _00.35 feet to the true
        point _ beginning; containing 0.59 acres,
        accordi_ to Certificate of Survey No. 440 on
        file an_ of record in the office of the Clerk
        and Rec_ der of Sanders County.

        The abo__ described property is hereinafter referred
to as "the pr__erty."

BAXTER
FLETCHER & HANSON
Attorneys at Law
PO Box 9
Thompson Falls, MT 59873

2.  For a period in excess of five years immediately
preceding the commencement of this action the Plaintiffs
have been in actual, visible, exclusive, hostile and
continuous possession of the property and the Plaintiffs
have paid real property taxes imposed against the property
for a period in excess of five years preceding the
commencement of this action.

3.  The Defendant County of Sanders claims or may
claim some interest in the property by virtue of a deed
from the Northern Pacific Railway Company in favor of the
County of Sanders dated October 1, 1958, recorded at
Volume 73 of Deeds, Page 154, by which the Northern
Pacific Railway Company purported to convey to Sanders
County its interest in the property which is the subject
of this action and other property, but such deed is
ineffective to convey any interest to Defendant Sanders
County in the property which is the subject of this action
and the claim of Plaintiffs to the property is superior to
any claim of Sanders County based on said deed or any
other theory of fact or law.

4.  Defendant Burlington Northern Railroad as
successor to Northern Pacific Railway Company claims or
may claim an interest in the property by reason of an
easement over the property which Northern Pacific Railway
Company once held pursuant to the Northern Pacific Railway
Grant Act of July 2, 1864, but in approximately 1954 the
Northern Pacific Railway Company abandoned the right-of-
way for railroad use and pursuant to 43 USC 912 the right-
of-way over the property so abandoned reverted to the
underlying owner of the title to the property and the
Defendant Burlington Northern Railroad has no right, title
or interest in the property by virtue of the said grant to

1  Northern Pacific Railway Company or any other theory of

2  fact or law.

3      5.  The Defendant Fred L. Rowe and the wife, if any,

4  of Fred L. Rowe and the heirs and devisees of the

5  Defendant Fred L. Rowe or the wife, if any, of Fred

6  L. Rowe claim or may claim an interest in the property

7  arising from the acquisition of an interest in the

8  property by Fred L. Rowe in 1944, but any such interest

9  acquired by said Defendants by deed or under any other

10  theory of fact or law has been extinguished by the

11  Plaintiffs' acquisition of ownership by adverse

12  possession.

13      6.  No other Defendant named as or described as a

14  Defendant in the caption of this complaint has any right,

15  title, estate or interest or lien or encumbrance upon the

16  property or any thereof, adverse to Plaintiffs' ownership,

17  or any cloud upon Plaintiffs' title thereto, whether such

18  claim or possible claim be present or contingent.

19      WHEREFORE, Plaintiffs request judgment and decree of

20  the court as follows:

21      1.  That all Defendants be required to set forth the

22  nature of their claims and that all adverse claims of the

23  Defendants and each of them be determined by a decree of

24  this court.

25      2.  That by decree of this court it be adjudicated

26  and declared that each of the Defendants named above and

27  all persons unknown, claiming or who might claim any

28  right, title, estate or interest in, or lien or

29  encumbrance upon, the real property described in the

30  complaint, or any thereof adverse to Plaintiffs' ownership

31  or any cloud upon any of Plaintiffs' title thereto,

32  whether such possible claim be present or contingent, have

1  no interest in the property and that the title of the

2  Plaintiffs in each count be declared good, complete,

3  perfect and valid title to the property described in

4  paragraph 1 hereof.

5       3.  That the Defendants herein named and each of

6  them be forever enjoined from asserting any claim or

7  interest in any of the property which is the subject of

8  this action or any part thereof adverse to Plaintiffs'

9  title or ownership.

10      4.  For such other further relief as the court may

11 deem proper.

12      DATED this _26th_ day of _September_, 1985.

13                     BAXTER, FLETCHER & HANSON

14

15                     By _____
                       Robert L. Fletcher

16                     Attorneys for Plaintiffs
                       P. O. Box 9

17                     Thompson Falls, MT  59873

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

BAXTER
FLETCHER & HANSON
Attorneys at Law
P.O. Box 9
Thompson Falls, MT 59873

# Exhibit 13

10   957

```
1   ROBERT L. FLETCHER
    Attorney at Law
2   P. O. Box 9
    Thompson Falls, Montana 59873              FILED Oct 13 19 87
3   (406) 827-4381
4                                              Carol Thomas
5                                                           T
                                               BY
6                                                       CLT
7
8   IN THE DISTRICT COURT OF THE TWENTIETH JUDICIAL DISTRICT OF
    THE STATE OF MONTANA IN AND FOR THE COUNTY OF SANDERS
9
    Cause No. DV-85-37
10
    RICHARD OLSON & MARY E. OLSON,
11
                     Plaintiffs,
12
            -vs-
13
    1.  COUNTY OF SANDERS, a political subdivision; and
14
    2.  BURLINGTON NORTHERN RAILROAD, successor to
15      NORTHERN PACIFIC RAILWAY COMPANY; and
16  3.  FRED L. ROWE and his wife, if any, and the heirs
        and devisees of Fred L. Rowe and the wife of Fred
17      L. Rowe, if any; and
18  4.  All other persons, unknown, claiming or who might
        claim any right, title, estate, or interest in or
19      lien or encumbrance upon the real property described
        in the Complaint adverse to Plaintiffs' ownership or
20      any cloud upon Plaintiff's title thereto, whether such
        claim or possible claim be present or contingent,
21
                     Defendants.
22
    --------------------------------------------------------
23                  DECREE QUIFT'.  TITLE
24  --------------------------------------------------------
25      Plaintiffs, RICHARD OLSON & MARY E. OLSON, on October
26  13, 1987, moved the Court for a default judgment against all
27  Defendants above named, pursuant to Rule 55 (b) (2)
28  M.R.Civ.P.  It appears from the pleadings filed herein that
29  each Defendant specifically named in this action and all
30  other persons designated as other persons unknown were
31  served personally or by publication as provided by law or
32  acknowledged service of Summons and Complaint upon them.
        The Defendant, County of Sanders, by Stipulation filed
```

BAXTER,
FLETCHER & HANSON
Attorneys at Law
P.O. Box 9
Thompson Falls, MT 59873

1    herein, has consented to the entry of a Decree Quieting
2    Title as to the County of Sanders except as to any claim of
3    lien for unpaid real property taxes, which the Defendant,
4    County of Sanders, now has or may hereafter claim.

5        Defendant, Burlington Northern Railroad by pleadings
6    filed herein has consented to the entry of Judgment as
7    prayed for by the Complaint.

8        It appears from the pleadings herein that a good and
9    sufficient Notice of Pendency of action was filed with the
10   County Clerk & Recorder of Sanders County prior to the
11   issuance of an Order for Publication of Summons and that
12   proof thereof was made to the Court.

13       It appears that each Defendant designated in paragraph
14   3 and 4 of the caption of the Complaint herein has been duly
15   served by publication and has failed to plead or other
16   defend against the allegations of the Complaint.  On motion
17   of counsel for Plaintiff the default of such parties was
18   entered.

19       Thereupon Plaintiffs produced evidence in support of
20   the allegations of the Complaint from which it appears that
21   the Plaintiffs are the owners of legal title in fee, free of
22   all encumbrances except those alleged in the Complaint and
23   liens which may now exist or may hereafter accrue for unpaid
24   real property taxes, and that none of the Defendants in this
25   action has any right, title or interest in or to any of the
26   real property which is the subject of this action except for
27   such claim of lien for taxes, and that the allegations of
28   the Plaintiffs' Complaint are true.

29       NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND
30   DECREE AS FOLLOWS:

31       1.  That each of the Defendants above named and all
32   persons unknown claiming or who might claim any right,

     DECREE QUIETING TITLE - Page 2

BAXTER,
FLETCHER & HANSON
Attorneys at Law
P.O. Box 9
Thompson Falls, MT 59873

10  357

1  title, estate, or interest in or lien or encumbrance upon

2  the real property described in the Complaint adverse to

3  Plaintiffs' ownership or any cloud upon Plaintiff's title

4  thereto, whether such claim or possible claim be present or

5  contingent, have no interest in the property and that the

6  title of the Plaintiffs is hereby declared good, complete,

7  perfect and valid title to the property in Sanders County,

8  Montana, more particularly described as follows:

9  That portion of the Northeast quarter of the Northeast
   quarter (NE1/4NE1/4) of Section 30, Township 26 North, Range
10 32 West, M.P.M., Sanders County, Montana, described as
   follows:

11 Commencing at the Northeast corner of said Section 30, said
   point being the true point of beginning; thence S 0°04' E.
12 along the East line of said Section 30 a distance of 223.32
   feet to the Northeasterly right of way of an existing county
13 road; thence N.45°48' West along said right of way 321.67
   feet to the North line of said Section 30; thence S. 89°46'
14 East along said North line 230.35 feet to the true point of
   beginning, containing 0.59 acres, according to Certificate
15 of Survey No. 440 on file and of record in the office of the
   Clerk and Recorder of Sanders County, Montana.
16

17 SUBJECT TO liens now existing or hereafter accruing in favor
   of Sanders County, Montana, for real property taxes accruing
18 thereon;

19     2.  That the Defendants herein named and each of them

20 be forever enjoined from asserting any claim or interest in

21 any of the property above described, or any part thereof

22 adverse to the Plaintiffs' title or ownership.

23     DONE IN OPEN COURT this 13th day of October, 1987.

24

25                 C.B. McNeil, District Court Judge

26 ol.Decree
   Sept
27

28

29

30

31

32

DECREE QUIETING TITLE - Page 3

# Exhibit 14

```
 1  Claude I. Burlingame
 2  Attorney at Law
 3  P.O. Box 9
 4  Thompson Falls, Montana  59873
 5  406-827-4381
 6  Attorney for Plaintiff
 7
 8
 9
10        MONTANA TWENTIETH JUDICIAL DISTRICT COURT, SANDERS COUNTY
11
12  NOXON RURAL FIRE DISTRICT,              *   Cause No. 96-06
13  A POLITICAL SUBDIVISION                 *
14  OF SANDERS COUNTY, MONTANA;             *
15                                          *
16                    Plaintiff,            *
17                                          *
18  THOMAS EVANS; THE UNITED STATES         *
19  OF AMERICA; BURLINGTON NORTHERN         *
20  RAILROAD COMPANY AS SUCCESSOR IN        *
21  INTEREST TO THE NORTHERN PACIFIC        *
22  RAILWAY COMPANY; SANDERS COUNTY,        *
23  A QUASI MUNICIPAL CORPORATION           *
24  OF THE STATE OF MONTANA;                *
25  WASHINGTON WATER POWER COMPANY,         *
26  A WASHINGTON CORPORATION;               *
27  and all unknown heirs and              *
28  devisees of any Defendant who          *
29  may be deceased, and any and           *
30  all other persons unknown,             *
31  claiming or who might claim            *
32  any right, title, interest or          *
33  estate in, or lien or encumbrance      *
34  upon the real property described       *
35  in the Complaint, or any part          *
36  thereof, adverse to the                *
37  Plaintiff's ownership, or any          *
38  cloud upon Plaintiff's title           *
39  thereto, whether such claim or         *
40  possible claim be present or           *
41  contingent, including any claim        *
42  or possible claim of dower,            *
43  inchoate or accrued,                   *
44                                          *       C O M P L A I N T
45                    Defendants.           *
46  * * * * * * * * * * * * * * * * * * * *
47
48
49        COMES NOW, the Plaintiff, and for its cause of action
50  against the above named and unnamed, known and unknown Defendants,
51  alleges:
```

1

2

3

4          1.    The Plaintiff brings this action pursuant to the

5    provisions of §70-19-409, et seq., and §70-28-101, et seq., MCA,

6    to quiet title in the Plaintiff to the following described real

7    property in Sanders County, Montana:

8              A parcel of land in Government Lots 8 and 9,
9              Section 19, Township 26 North, Range 32 West,
10             PMM, described as follows:
11
12             Commencing at the N-S 1/64 corner on the
13        West boundary of Section 19; thence
14             North 550.32' to the northerly right-of-
15        way of Front Street; thence
16             South 68°37'28" East along said northerly
17        boundary, 1123.27' to the point of beginning;
18        thence
19             South 68°37'28" East, 553.29'; thence
20             North 21°22'32" East, 150.00' to the
21        Washington Water Power Project Boundary;
22        thence
23             North 68°37'28" West, along said project
24        boundary, 553.29'; thence
25             South 21°22'32" West, 150.00' to the
26        point of beginning, and containing 1.905
27        acres, more or less;
28
29   hereinafter designated "Parcel").

30         2.    The Plaintiff has maintained open, adverse, actual,

31   continuous occupation of the parcel under claim of title,

32   exclusive of any other right, for a period in excess of five (5)

33   years prior to the commencement of this action.  The occupation

34   has consisted of the erection of a fire station on the parcel, and

35   the possession and use of a storage building on the property.

36   Throughout this occupation, the Plaintiff has maintained and

COMPLAINT - Page 2

1  operated its fire station, and used the parcel for the site of its
2  fire station.

3      3.  On or about 1897, the Northern Pacific Railway Company
4  maintained a railroad track across portions of the parcel.  The
5  Northern Pacific Railway Company owned a fee simple interest in
6  the 400-foot right-of-way across the portion of the parcel lying
7  in Government Lot 9, Section 19, Township 26 North, Range 32 West,
8  PMM.  The Northern Pacific Railway Company owned a right-of-way
9  by Act of Congress, 400 feet in width, being 200 feet on either
10  side of the centerline of the railroad tracks, across the portion
11  of the parcel lying in Government Lot 8, Section 19, Township 26
12  North, Range 32 West, PMM.  The Northern Pacific Railway Company
13  abandoned the railway right-of-way and railroad tracks across the
14  parcel during 1951 through 1953.

15      4.  By reason of the Northern Pacific Railway Company's
16  abandonment of its right-of-way, and the provisions of Title 43
17  of the United States Code, Section 912, the Plaintiff now owns any
18  portion of the former railroad right-of-way lying within the
19  exterior boundaries of the parcel.  The surface rights incident
20  to the railroad right-of-way across Government Lot 8, Section 19,
21  Township 26 North, Range 32 West, reverted to the owner of the
22  underlying fee.

23      5.  There have been no taxes levied or assessed against
24  the parcel during the time of Plaintiff's occupancy, up through
25  the date of commencement of this action.

26      6.  The Plaintiff does now hold the parcel under claim of

COMPLAINT - Page 3

1  title; the Plaintiff herein is entitled to a decree quieting title

2  in said parcel in the Plaintiff.

3      7.  The above-named Defendants may have, or claim to have,

4  or may claim to have some right, title, interest, claim or

5  possible claim, in or upon the parcel, or to parts thereof, which

6  are adverse to the Plaintiff's rights and title, but which said

7  interest or pretended claims are without any foundation whatever,

8  and now constitute a cloud upon the Plaintiff's title; and that

9  any right, title, claim or interest that Defendants have or claim

10  to have in or to said lands and premises, or any parts thereof,

11  is subject to and inferior to the right and title of the Plaintiff

12  herein, and by reason thereof the Plaintiff is now the lawful

13  owner and holder of said parcel.

14      8.  The Plaintiff has joined, as known Defendants, all

15  persons known to it claiming, or who might claim, any right,

16  title, estate or interest in, or lien or encumbrance upon the

17  parcel, or any part thereof, adverse to the Plaintiff's ownership,

18  or any cloud upon the Plaintiff's title thereto, whether such

19  claim be present or contingent.

20      WHEREFORE, Plaintiff prays judgment and decree against the

21  Defendants as follows:

22      1.  That the Defendants, and each of them, be required to

23  set forth the nature of their claims or liens, and each of them,

24  if any they have.

25      2.  That all adverse claims or liens of the Defendants,

26  and each of them, be determined by a decree of this Court.

COMPLAINT - Page 4

1       3.    That the Court declare that the portion of the railway

2   right-of-way which formerly crossed Government Lot 8, Section 19,

3   Township 26 North, Range 32 West, PMM, was abandoned by act of the

4   Northern Pacific Railway Company during 1951 through 1953, and

5   revested to the owner of the underlying fee.

6       4.    That the Court declare and adjudge by its decree that

7   the Plaintiff has maintained open, adverse, actual, continuous

8   occupation of the parcel under claim of title, exclusive of any

9   other right, for a period in excess of five (5) years prior to the

10  commencement of this action.

11      5.    That the Court declare and adjudge by its decree that

12  the Defendants, and each of them, have no right, title, interest

13  or lien whatsoever in or to the parcel, or any part thereof, and

14  that they be forever debarred from asserting any claim whatsoever

15  in or to said parcel adverse to the Plaintiff.

16      6.    That the Plaintiff be declared to be the owner of the

17  parcel and possessed of valid title.

18      7.    That the Plaintiff may recover its costs herein

19  accrued against any Defendant who shall appear and defend this

20  action.

21

22  \\\

23  \\\

24  \\\

25  \\\

26  \\\

COMPLAINT - Page 5

8.    For such other and further relief as the Court may deem just and equitable.

CLAUDE I. BURLINGAME
Attorney for Plaintiff
P.O. Box 9
Thompson Falls, Montana    59873

STATE OF MONTANA        )
                        :ss.
County of Sanders       )

    ROLAND K. MERCER, _____ of Noxon Rural Fire District, being first duly sworn, upon oath, deposes and says:

    That he has read the foregoing, and that the facts and matters contained therein are true, accurate and complete to the best of his knowledge and belief.

ROLAND K. MERCER

    SUBSCRIBED AND SWORN to before me this _____ day of _____, 1995.

Notary Public - State of Montana
Residing at:
My Commission Expires:

\Dec95\Fire.cmp

COMPLAINT - Page 6

# Exhibit 15

1
2 CLAUDE I. BURLINGAME      ꞁ.ED *Mar 4* 19 96
3 P. O. Box 9              *Evelyn Cox*
 Thompson Falls, Montana 59873    COUNTY CLERK OF COURT
4 (406) 827-4381
5 Attorney for Plaintiffs
6                  DEPUTY
7
8
9  MONTANA TWENTIETH JUDICIAL DISTRICT COURT, SANDERS COUNTY
10
11 NOXON RURAL FIRE DISTRICT,  * Cause No. 96-06
12 A POLITICAL SUBDIVISION OF  *
13 SANDERS COUNTY, MONTANA;  *
14    Plaintiffs,      *
15            *
16  vs.          *
17            *
18 THOMAS EVANS; et al    * STIPULATION
19    Defendants.     *
20 * * * * * * * * * * * * * * * * * * * * * * * * * * *
21
22    The Plaintiff and the United States of America agree that the Plaintiff may take judgment

23 as requested in the Complaint, subject to the exceptions which were expressly reserved in the

24 original United States patent to Thomas Evans, dated May 18, 1914, recorded June 1, 1914 at

25 Volume 20 of Deeds, Page 311, Sanders County records; and original patent to the Northern Pacific

26 Railroad Company, dated May 28, 1906, recorded August 1, 1906 at Volume 3 of Deeds, Page

27 419-46, Sanders County records.

28    DATED this 22nd day of February, 1996.

29
30
31
32            CLAUDE I. BURLINGAME
33            Attorney for Plaintiff
34
35
36            DEANNE SANDHOLM
37            Assistant United States Attorney
38            Attorney for United States of America

# Exhibit 16

CLAUDE I. BURLINGAME
Attorney at Law
P. O. Box 9
Thompson Falls, Montana 59873
(406) 827-4381
Attorney for Plaintiff

FILED Nov 13 19 96

_Evelyn Cox_
COUNTY CLERK OF COURT

BY_____
DEPUTY

Miked # 18982
Rec. Nov. 14, 1996 @ 2:30

### MONTANA TWENTIETH JUDICIAL DISTRICT COURT, SANDERS COUNTY

NOXON RURAL FIRE DISTRICT,          *       Cause No. DV-96-06
A POLITICAL SUBDIVISION OF          *
SANDERS COUNTY, MONTANA,            *
                 Plaintiff,          *
                                     *
    vs.                              *
                                     *
THOMAS EVANS; THE UNITED            *       JUDGMENT
STATE OF AMERICA; BURLINGTON        *       AND DECREE
NORTHERN RAILWAY COMPANY            *
AS SUCCESSOR IN INTEREST TO         *
THE NORTHERN PACIFIC RAILWAY        *
COMPANY; SANDERS COUNTY, A          *
QUASI MUNICIPAL CORPORATION         *
OF THE STATE OF MONTANA;            *
WASHINGTON WATER POWER              *
COMPANY, A WASHINGTON               *
CORPORATION; and all unknown        *
heirs and devisees of any Defendant who *
may be deceased, and any and all other *
persons unknown claiming or who might *
claim any right, title or interest, or *
estate in, or lien or encumbrance upon *
the real property described in the    *
Complaint, or any part thereof, adverse *
to the Plaintiff's ownership or any cloud *
upon Plaintiff's title thereto, whether such *
claim or possible claim be present or *
contingent, including any claim of dower, *
inchoate or accrued,                 *
                 Defendants.         *
************************************************

In this action, the Defendant, United States of America was served with Summons and

Complaint on January 16, 1996, and on March 4, 1996 filed with this Court its Stipulation

1   authorizing entry of judgment. The Defendant, Burlington Northern Railroad Company was served

2   with Summons and Complaint on January 30, 1996, and on February 28, 1996 filed with this Court

3   its Disclaimer of Interest. The Defendant, Washington Water Power Company was served with

4   Summons and Complaint on February 13, 1996, and on September 30, 1996 filed with this Court

5   its Stipulation for Entry of Judgment. The Defendant, Sanders County acknowledged service of

6   said Summons and Complaint on January 11, 1996 and has not filed any further appearance or

7   pleading; and the Defendant, Thomas Evans was served with Summons by Publication on February

8   29, March 7 and March 14, 1996. The Defendants, Sanders County and Thomas Evans, having

9   failed to appear and answer the Plaintiff's Complaint filed herein, the legal time for answering having

10  expired and no answer, appearance or other pleading having been filed, the default of these

11  Defendants was duly entered on October 31, 1996, according to law, upon application of the

12  Plaintiff to the Clerk, and after proof of publication of Summons. The Plaintiff has filed herein an

13  Affidavit showing, to the satisfaction of the Court, that the Defendants not personally served are

14  not in the Military Service; (a) as a member of the Army of the United States, or the United States

15  Navy, or the Marine Corps, or the Coast Guard, or an officer of the Public Health Service detailed

16  by proper authority for duty either with the Army or Navy; or (b) in training or being educated

17  under the supervision of the United States preliminary to induction into the Military Service thereof;

18  nor are these Defendants infants or incompetent persons.

19      Now, upon Plaintiff's Application for Entry of Judgment, and the cause duly coming before

20  the Court, and the Court having considered the evidence and law, and pursuant to the prayer of the

21  Complaint, Plaintiff shall have judgment against the Defendants.

22  \\\

JUDGMENT AND DECREE - Page 2

1    IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the allegations of the

2    Complaint are true, and the Plaintiff is entitled to judgment as demanded in the Complaint, and

3    Plaintiff is now, and at all times concerned, has been the owner of the real property in Sanders

4    County, Montana, described as follows:

5        A parcel of land in Government Lots 8 and 9, Section 19, Township
6        26 North, Range 32 West, PMM, described as follows:
7
8            Commencing at the N-S 1/64 corner on the West boundary of
9        Section 19; thence
10            North 550.32' to the Northerly right-of-way of Front Street;
11       thence
12            South 68°37'28" East along said Northerly boundary 1123.27'
13       to the point of beginning; thence
14            South 68°37'28" East, 553.29'; thence
15            North 21°22'32" East, 150.00' to the Washington Water
16       Power Project Boundary; thence
17            North 68°37'28" West, along said project boundary, 553.29';
18       thence
19            South 21°22'32" West, 150.00' to the point of beginning and
20       containing 1.905 acres, more or less;
21
22       SUBJECT to the reservations contained in the original United States
23       patent to Thomas Evans, dated May 18, 1914, recorded June 1, 1914
24       at Volume 20 of Deeds, Page 311, Sanders County records; and
25       original United States patent to the Northern Pacific Railway
26       Company, dated May 28, 1906, recorded August 1, 1906 at Volume
27       3 of Deeds, Page 419-46, Sanders County records;
28
29

30    \\\

31    \\\

32    \\\

33    \\\

34    \\\

1    and the Defendants, and each of them, have no right, title, estate or interest in, or lien or

2    encumbrance upon, said real property, and the title of the Plaintiff in and to all of said real property

3    is quieted, and the clouds cast thereon by the claims or possible claims of the Defendants are

4    removed, and the Defendants are hereby enjoined from asserting any right, title, estate or interest

5    in, or lien upon, said real property adverse to Plaintiff's title.

6        DATED this 12 day of November, 1996.

7

8                                                    C. B. McNeil

9                                                    C.B. McNEIL

10                                                   District Court Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32        STATE OF MONTANA }
33        COUNTY OF SANDERS }
34
35                                         ORIGINAL
36
37
38              13     Nov      19 96
39
40        Envelope    Cox
41        CLERK OF DISTRICT COURT, SANDERS COUNTY, MONT.
42
43
44
45   Oct96\Fire.jud

JUDGMENT AND DECREE - Page 4

# Exhibit 17

# 783                          R. W. 6090

THIS INDENTURE, Made the 1st day of October in the year of our Lord One Thousand Nine Hundred and Fifty-eight (1958) between NORTHERN PACIFIC RAILWAY COMPANY, a corporation organized and existing under the laws of the State of Wisconsin, the party of the First Part, hereinafter called Railway Company, and the COUNTY OF SANDERS, State of Montana, the party of the Second Part, hereinafter called County.

WITNESSETH:

WHEREAS, a portion of the Railway Company's main line track in the vicinity of Noxon, Montana, has been relocated from the south side of the Clark Fork of the Columbia River to the north side thereof on account of the construction of a dam in connection with the Noxon Rapids Hydro Electric Development Project by the Washington Water Power Company, a Washington corporation; and

WHEREAS, the County desires to acquire a portion of the right of way for said former main line track to construct a highway thereon to serve a proposed recreational area in the vicinity of said dam and the Railway Company is agreeable to conveying said right of way to the County;

WHEREAS, reference is hereinafter made to the center line of the Railway Company's main track as the same was relocated. Said main track across the North Half (N½), Section Thirty-two (32), across Sections Twenty-nine (29), Twenty (20), Thirty (30) and Government Lot Eleven (11), Section Nineteen (19), all in Township Twenty-six (26) North, Range Thirty-two (32) West, Montana Principal Meridian, on the south side of said river, was relocated in the years 1905, 1906 and 1907. Said main track across the West Half (W½) of said Section Nineteen (19), across Sections Twenty-four (24), Twenty-three (23), Fourteen (14), Fifteen (15) and Ten (10), all in Township Twenty-six (26) North, Range Thirty-three (33) West, Montana Principal Meridian, on the south side of said river was relocated in the years 1951, 1952 and 1953.

NOW THEREFORE, the Railway Company for and in consideration of the sum of One Dollar ($1.00) and other good and valuable considerations, to it in hand paid by the County, the receipt of which is hereby acknowledged, does hereby convey, remise, release and forever quitclaim unto the County or its successors, all of its right, title and interest in and to the following described real estate, situated in the County of Sanders and State of Montana, to-wit:

1.  Those portions of Government Lots Two (2) and Three (3), Section Thirty-two (32), Township Twenty-six (26) North, Range Thirty-two (32) West, Montana Principal Meridian, lying between lines parallel with and distant respectively two hundred (200) feet northeasterly and two hundred (200) feet southwesterly, measured at right angles from the center line of the original main track of the Railway Company as the same was formerly constructed and operated, but removed and relocated.

2.  Those portions of Government Lots Three (3), Six (6), Seven (7), Southwest Quarter Northwest Quarter (SW¼NW¼) and Northeast Quarter Southwest Quarter (NE¼SW¼), Section Twenty-nine (29), said Township and Range, lying northeasterly of a line drawn parallel and concentric with and distant two hundred (200) feet southwesterly, measured at right angles and radially from the center line of said original main track.

3.  That portion of Government Lot Two (2), Section Twenty-nine (29); those portions of Government Lot Two (2), Section Twenty (20); of Northeast Quarter Northeast Quarter (NE¼NE¼), Section Thirty (30); and of Government Lots Eleven (11) and Seven (7), Southwest Quarter

-1-

Southeast Quarter (SW¼SE¼), Section Nineteen (19), all in said
Township and Range, lying between lines parallel and concentric
with and distant respectively two hundred (200) feet northeasterly
and two hundred (200) feet southwesterly, measured at right angles
and radially from the center line of said original main track.

4. Those portions of Government Lots Eight (8), Nine (9), and
Five (5), said Section Nineteen (19); of the Northeast Quarter
Southeast Quarter (NE¼SE¼), of Government Lots Eight (8), Seven
(7), and Six (6), Section Twenty-four (24), Township Twenty-six
(26) North, Range Thirty-three (33) West, Montana Principal Meri-
dian, lying northeasterly of a line parallel with and distant two
hundred (200) feet southwesterly, measured at right angles from
the center line of said original main track and lying southwest-
erly of a line parallel with and distant two hundred (200) feet
northeasterly, measured at right angles from the center line of
said relocated main track.

5. A tract of land in Government Lots Six (6) and Seven (7),
said Section Twenty-four (24), being described as follows: Start-
ing at the East Quarter (E¼) corner of said Section Twenty-four
(24); thence north Eighty-nine Degrees Forty-one Minutes (89°41')
West Six hundred six (606) feet along the midsection line; thence
north Sixty-eight Degrees Fifty Minutes (68°50') West seven hund-
red fifty-two and nine tenths (752.9) feet to a point on the east
line of said Lot Seven (7), which point is the true point of be-
ginning; thence north Sixty-eight Degrees Fifty Minutes (68°50')
West two thousand one hundred ninety-seven (2,197) feet; thence
north Sixty-six Degrees Thirty-two Minutes (66°32') West six hun-
dred seventy-four and three tenths (674.3) feet to a point on the
west line of said Lot Six (6); thence north One Degree Twenty-
four Minutes (1°24') West along the west line of said Lot Six (6)
seventy-seven and four tenths (77.4) feet to a point in a line
parallel with and distant two hundred (200) feet southwesterly,
measured at right angles from the center line of said original
main track; thence south Sixty-eight Degrees Twenty Minutes (68°
20') East along last mentioned parallel line two thousand eight
hundred seventy-one and six tenths (2,871.6) feet to a point on
the east line of said Lot Seven (7); thence south One Degree
Twenty-four Minutes (1°24') East along the east line of said Lot
Seven (7), Eighty (80) feet, more or less, to the true point of
beginning; being a portion of the same premises acquired by the
Railway Company by deed dated February 26, 1953, filed May 5, 1953
in Volume 59 of Deeds, Page 64, records of said County.

6. That portion of Government Lot Five (5), said Section
Twenty-four (24); those portions of Government Lot One (1), North-
west Quarter Northeast Quarter (NW¼NE¼), Section Twenty-three (23),
of Government Lots Eight (8) and Seven (7), Section Fourteen (14),
all in Township Twenty-six (26) North, Range Thirty-three (33) West,
Montana Principal Meridian, lying northeasterly of a line parallel
and concentric with and distant two hundred (200) feet southwest-
erly, measured at right angles and radially from the center line
of said original main track and lying southwesterly of a line
parallel and concentric with and distant two hundred (200) feet
northeasterly, measured at right angles and radially from the cen-
ter line of said relocated main track.

7. A tract of land in Government Lot Seven (7), said Section
Fourteen (14), being described as follows: Beginning at a point
on the west line of said Lot Seven (7), North Zero Degrees Twenty-
two Minutes Ten Seconds (0°22'10") West five Hundred seventy-eight
and three tenths (578.3) feet from the southwest corner of said
Lot Seven (7), which point is the true point of beginning; thence

South Eighty-nine Degrees, Two Minutes Forty Seconds (89°02'40")
East three hundred sixty-six and three tenths (366.3) feet; thence
North Seventy-seven Degrees Fifteen Minutes Ten Seconds (77°15'10")
West one hundred twenty-two (122) feet; thence North Eighty-nine
Degrees Two Minutes Forty Seconds (89°02'40") West two hundred
forty-seven and five tenths (247.5) feet along a line parallel and
concentric with and distant two hundred (200) feet southerly,
measured at right angles and radially from the center line of
said original main track to a point on the west line of said Lot
Seven (7); thence South Zero Degrees, Twenty-two Minutes Ten Se-
conds (0°22'10") East twenty-five (25) feet, more or less, along
the west line of said Lot Seven (7) to the true point of beginning;
also

A tract of land in said Government Lot Seven (7), described
as follows:  Beginning at the west quarter corner of Section
Twenty-four (24), said Township and Range; thence North Forty-
three Degrees Eleven Minutes (43°11') West four thousand one
hundred thirty-eight and ninety-three hundredths (4,138.93) feet
to the true point of beginning; thence south Seventy-seven De-
grees Four Minutes (77°04') East sixty-eight and eighty-seven
hundredths (68.87) feet; thence north Sixty-eight Degrees Twenty
Minutes (68°20') West along a line parallel and concentric with
and distant two hundred (200) feet southerly, measured at right
angles with and radially from the center line of said original
main track sixty-eight and seven hundredths (68.07) feet to a
point which is the beginning of a two degree (2°) curve to the
left; thence along said parallel line and said two degree (2°)
curve to the left a distance of Nine hundred thirty-four and
nine tenths (934.9) feet; thence South Seventy-seven Degrees
Four Minutes (77°04') East nine hundred twenty-nine and three
tenths (929.3) feet, more or less, to the true point of begin-
ning.

The premises described in Parcel 7 above are a portion of
the same premises acquired by the Railway Company by deed dated
February 26, 1953, recorded May 5, 1953 in Volume 59 of Deeds,
Page 64, records of said County.

8.   That portion of Government Lot Six (6), said Section
Fourteen (14) described as follows:  Beginning at a point in the
east line of said Government Lot Six (6) where the same is inter-
sected by a line parallel and concentric with and distant two
hundred (200) feet southerly and southwesterly, measured at right
angles and radially from the center line of said original main
track; thence northwesterly along said parallel and concentric
line to its intersection with the west line of said Government
Lot Six (6); thence north along the west line of said Government
Lot Six (6) to a point in a line parallel and concentric with and
distant two hundred (200) feet northeasterly, measured at right
angles and radially from the center line of said original main
track; thence southeasterly along last mentioned parallel and
concentric line to its intersection with a line concentric and
parallel with and distant two hundred (200) feet northeasterly,
measured radially and at right angles from the center line of
said relocated main track; thence southeasterly, along last men-
tioned concentric and parallel line to its intersection with the
east line of said Government Lot Six (6); thence south along the
east line of said Government Lot Six (6) to the point of beginning.

9.   Those portions of the Southeast Quarter Southeast Quarter
(SE¼SE¼), of Government Lots Six (6), Four (4), Three (3), and North-
west Quarter Northwest Quarter (NW¼NW¼), Section Fifteen (15), Town-
ship Twenty-six (26) North, Range Thirty-three (33) West, Montana

Principal Meridian, lying northeasterly of a line parallel and con-
centric with and distant two hundred (200) feet southwesterly, measured
at right angles and radially from the center line of said original main
track and lying southwesterly of a line parallel and concentric with
and distant two hundred (200) feet northeasterly, measured at right
angles and radially from the center line of said relocated main track.

10.    Those portions of Government Lots Four (4), Three (3), and
Northwest Quarter Northwest Quarter (NW¼NW¼), said Section Fifteen
(15), lying between said parallel and concentric line two hundred (200)
feet southwesterly, from the center line of said original main track
and a line parallel and concentric with and distant one hundred (100)
feet southwesterly, measured at right angles and radially from the
center line of said relocated main track.

11.    That portion of Government Lot Four (4), Section Ten (10),
Township Twenty-six (26) North, Range Thirty-three (33) West, Montana
Principal Meridian, lying northeasterly of a line parallel and concen-
tric with and distant two hundred (200) feet southwesterly, measured
at right angles and radially from the center line of said original
main track; lying southwesterly of a line  parallel and concentric with
and distant two hundred (200) feet northeasterly, measured at right
angles and radially from the center line of said relocated main track,
and lying southeasterly of a line at right angles to said relocated
main track center line at a point therein distant one hundred eighty-
three (183) feet southeasterly, (relocated main track Station 14130
plus 05) measured along said relocated track center line from its in-
tersection with the west line of said Government Lot Four (4).

Excepting from the conveyance of the property above described
those certain improvements and appurtenances thereto, located thereon
being described as follows, to-wit:  The communication and signal fa-
cilities formerly owned by the Railway Company and the Western Union
Telegraph Company conveyed to the said Washington Water Power Company
by Bill of Sale dated October 1, 1958 and said former main line track,
passing track, side track, spur tracks, buildings, structures and im-
provements of the Railway Company conveyed to said Washington Water
Power Company by Bill of Sale dated October 1, 1958.

Together with all the tenements, hereditaments, and appurtenances
thereunto belonging, and the reversion and reversions, remainder and remainders,
rents, issues and profits thereof; and also all the estate, right, title, inter-
est, property, possession, claim and demand whatsoever, as well in law as in
equity, of the said Railway Company, of, in or to the said premises and every
part and parcel thereof.

TO HAVE AND TO HOLD, all and singular the said premises, with the ap-
purtenances unto the said County or its successors forever.

IN WITNESS WHEREOF, said Northern Pacific Railway Company has caused
its corporate name to be subscribed and its corporate seal to be affixed, by
its proper officers, thereunto duly authorized, the day and year first herein-
above written.

Witnesses:                                      NORTHERN PACIFIC RAILWAY COMPANY

_Beatrice E. Nachtrieb_                          By _E F Swanson_
                                                              Vice President
_Richard J. McKenzie_                            Attest _Carr J Marshall_
                                                              Secretary

-4-

STATE OF MINNESOTA )
                   ) ss
COUNTY OF RAMSEY   )

        On this _1st_ day of _October_ in the year 1950, before me _____ _V. W. Thayer_, a Notary Public for the State of Minnesota, personally appeared E. B. Stanton, known to me to be the Vice President of the corporation that executed the within instrument and acknowledged to me that such corporation executed the same.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

                                    _J. W. Thayer_

                                  V. W. Thayer
                              Notary Public Ramsey Co.
                              My Comm. Expires Nov 1?,

seal

# Exhibit 18

DEPOSITION
EXHIBIT
PENGAD 800-631-6989

A claim for refund of gasoline tax to the State Board of Equalization in the amount of $336.36 was signed by the Chairman.

It was unanimously agreed to advertize the following County land for sale, and the Clerk was instructed to post notice of a Public Auction to be held March 15, 1961 at 1:30 O'clock P.M. at the front door of the Courthouse:

| DESCRIPTION | APPRAISED VALUE |
|---|---|
| Lot 4, Block 14, Pineville Survey to Hot Springs | 120.00 |
| Tract See D.B. 26, Page 623, Sec. 19, Twp. 23N., Rge. 30W. | 25.00 |
| Lot 1, Block 4, Lonepine | 5.00 |
| Lot 11, Block 10, Lonepine | 5.00 |
| Lot 6, Block 17, Camas | 10.00 |

Terms Cash.

Upon motion by John F. Harwood and seconded by H. E. Smith, the bid of The Plainsman was accepted for the county printing as follows:

Legal Code price on all items.

The Plainsman was the one and only bid received.  The Clerk was instructed to prepare the necessary contract, same to be returned together with a Bond in the amount of $1500.00 for the approval of the Board at the March meeting.

The Board adjourned at 4:30 o'clock P.M.

WEDNESDAY, FEBRUARY 8TH, 1961

The Board of County Commissioners of Sanders County met in regular session on Wednesday February 8th, 1961 at 9:30 o'clock A.M.  Present were all its members and officers.

The following Official Bonds were approved and ordered filed by the Board:  Alex C. Morrison, Margaret Scott, Earl C. Tennant, Peter Jacobsen, Lyle Haase, James Taylor and Garth Howser.

The quarterly report of Margaret Scott, Justice of the Peace was also approved and ordered filed.

Richard Heater, Alderman, met with the Board in regard to the Thompson Falls Dump Ground.

The following abatements were approved:

| | | |
|---|---|---|
| 1959 Del. Real Estate – Betram P. Berger | Lot 4, Blk 14, Pineville, Hot Springs | 20.34 |
| 1958 Del. Real Estate – Betram P. Berger | Lot 4, Blk 14, Pineville, Hot Springs | 21.51 |
| 1957 Del. Real Estate – Betram P. Berger | Lot 4, Blk 14, Pineville, Hot Springs | 18.40 |
| 1956 Del. Real Estate – Betram P. Berger | Lot 4, Blk 14, Pineville, Hot Springs | 22.41 |
| 1959 Del. Real Estate – George Taylor | Lot 6, Blk 17, Camas | .97 |
| 1958 Del. Real Estate – George Taylor | Lot 6, Blk 17, Camas | .51 |
| 1957 Del. Real Estate – George Taylor | Lot 6, Blk 17, Camas | 1.07 |
| 1956 Del. Real Estate – George Taylor | Lot 6, Blk 17, Camas | 1.05 |
| 1959 Del Real Estate – George D. Rollins | Lot 1, Blk 14 & Lot 11, Blk 10, Lonepine | .69 |
| 1957 Del Real Estate – George D. Rollins | Lot 1, Blk 14 & Lot 11, Blk 10, Lonepine | .65 |
| 1956 Del. Real Estate – George D. Rollins | Lot 1, Blk 14 & Lot 11, Blk 10, Lonepine | .76 |
| 1959 Del. Real Estate – Anna C. Perry | Tract see DB26, P623, Sec. 19, Twp. 23N, Rge. 30W | 3.12 |
| 1958 Del. Real Estate – Anna C. Perry | Tract see DB 26, P623, Sec. 19, Twp. 23N, Rge. 30W | 2.17 |
| 1957 Del. Real Estate – Anna C. Perry | Tract see DB26, P623, Sec. 19, Twp. 23N, Rge. 30W | 2.94 |
| 1956 Del. Real Estate – Anna C. Perry | Tract see DB26, P623, Sec. 19, Twp. 23N, Rge. 30W | 3.11 |

A deed from the Northern Pacific Railway Co. to Sanders County for abandoned right-of-way from the Noxon Rapids Dam west to Bull River was accepted by the Board.

The following officers were given permission to leave the state for short intervals during the next sixty days:

Jesse W. Lee, H. E. Smith, John F. Harwood, Dorothy Dodson, Orin P. Kendall, Harvey W. Brauer, Ralph E. Goode, James H. Smith, Alex C. Morrison, A. Ben Cox, Vance Shrider, Orie E. Heater, E. H. Davis, Philip V. Bender, Herman J. Voss, G. E. Mathias, Margaret Scott and Frank Marsh.

The Board completed the auditing of the claims and the Clerk was instructed to draw warrants on the respective funds in payment of same.  (See Commissioners Journal Vol. 7, Pages 203 thru 207.)

Commissioners Lee, Smith and Harwood were authorized to attend to all necessary road and bridge matters in the County during the next thirty days.

The Board adjourned at 4:30 o'clock P.M.

ATTEST:

_Dorothy Dodson_
_____
Clerk

_Jesse W. Lee_
_____
Chairman, Board of County Commissioners

PROCEEDINGS OF THE BOARD OF COUNTY COMMISSIONERS OF SANDERS COUNTY, MONTANA

MONDAY, MARCH 6TH, 1961

The Board of County Commissioners of Sanders County met in regular session on Monday, March 6th, 1961 at 9:30 o'clock A.M.  Present were Jesse W. Lee, Chairman, H. E. Smith and John F. Harwood, Commissioners and Dorothy Dodson, Clerk.

The minutes of the last regular meeting were read and approved.

(CONTINUED ON PAGE 214)

CLAIMS AUDITED AND ALLOWED BY THE BOARD OF COUNTY COMMISSIONERS ON THEIR MEETINGS OF MARCH 6TH, 7TH & 8TH.

GENERAL FUND

| | | PURPOSE | AMOUNT |
|---|---|---|---|
| E96 | Dorothy Dodson | Clk & Rec | 331.75 |
| E97 | Floy O. Johnston | Dep | 298.57 |
| E98 | Dixie Vaught | Clk | 268.71 |
| E99 | Ralph E. Goode | Treas | 331.75 |
| E100 | Beulah L. Helms | Dep | 298.57 |
| E101 | Lucille G. Smith | Clk | 268.71 |
| E102 | Gloria V. Watters | Clk | 268.71 |
| E103 | Harvey W. Brauer | Ass'r | 331.75 |
| E104 | Kristine Kirkeberg | Dep | 298.57 |
| E105 | Averal N. Brauer | Clk | 268.71 |
| E106 | Paul F. Hill | Clk | 268.71 |
| E107 | James H. Smith | Clk of Crt | 341.75 |
| E108 | A. Ben Cox | Sher | 341.75 |
| E109 | Walter L. Lombard | Undersher | 324.66 |
| E110 | Harry Dodson | Jailer | 307.57 |
| E111 | Earl C. Tennant | " | 307.57 |
| E112 | Vern Dolson | " | 307.57 |
| E113 | William D. Bruce | Dep Sher | 60.00 |
| E114 | H. E. Schultz | " | 307.57 |
| E115 | R. W. Priddy | " | 125.00 |
| E116 | Richard J. Cole | " | 307.57 |
| E117 | Alex C. Morrison | Att'y | 170.87 |
| E118 | Lucille Dobson | Clk | 135.00 |
| E119 | Orin P. Kendall | Supt | 331.75 |
| E120 | Kathleen E. Smith | Clk | 150.00 |
| E121 | Hugh F. Hearing | Janitor | 130.00 |
| E122 | Pearl E. Hearing | Ass't Jan. | 130.00 |
| E123 | J. H. Mikkelson | Co Agt | 227.08 |
| E124 | Lillian M. Tubb | Home Dem | 100.00 |
| E125 | Annette Nelson | Clk | 268.71 |
| E126 | Montana Phys. Serv. | Bl Sh | 108.04 |
| E127 | Jesse W. Lee | Sal | (183.07) |
| E128 | John F. Harwood | " | 143.90 |

# Exhibit 19



WESLEY E. HANSEN, COMMISSIONER        HENRY L. GILL, COMMISSIONER        GEORGE W. WELLS, COMMISSIONER

DIXIE VAUGHT
CLERK & RECORDER

JUNE M. THAYER
TREASURER

PAUL J. FARLAN
ASSESSOR

JAMES L. PALMER
SUPT. OF SCHOOLS

WINIFRED I. VAN DERHOFF
CLERK DISTRICT COURT

ROBERT L. FLETCHER
ATTORNEY

A.H. CHENEY
SHERIFF

C.E. ROSDAHL
CORONER

## COUNTY OF SANDERS
### STATE OF MONTANA

Thompson Falls, Montana
59873

December 11, 1975

RECEIVED-W.W.P.CO.
RT OF WAY DEPT.

DEC 1 5 1975

Date Answered:_____By_____
Sent to File:_____By_____
Referred To: Berkes By RM

Washington Water Power Company
PO Box 3727
Spokane, Washington  99220

Attn:  Richard Muffett
       Rights of Way Supervisor

Dear Mr. Muffett:

Reference is made to your letter of November 3, 1975, concerning use of a portion of County road and access to abandoned Northern Pacific right-of-way to the Noxon Rapids dam for transporting components of the 5th unit.

There is no objection to your use of the approximately 250 yards of County road for unloading and transporting your equipment, nor do we anticipate any problem in the use of the old Northern Pacific railroad right-of-way for the same use, but we must point out that our authority over the old Northern Pacific right-of-way is covered only by a Quitclaim deed to Sanders County.

We note in your letter that you plan to take all necessary safety precautions while your operations are in progress.

If we can be of further assistance please feel free to contact me.

Yours truly,

Henry L. Gill, Commissioner
District #3
Sanders County, Montana

HLG?lb

# Exhibit 20

1   JOHN F. SULLIVAN
2   HUGHES, KELLNER, SULLIVAN & ALKE
    406 Fuller Avenue
    P.O. Box 1166
3   Helena, MT 59624-1166
    (406) 442-3690

4   ATTORNEYS FOR PLAINTIFF

FILED May 2 19 96

_Evelyn Cox_
COUNTY CLERK OF COURT

_____
DEPUTY

8   MONTANA TWENTIETH JUDICIAL DISTRICT COURT, SANDERS COUNTY

9                      * * * * *

10   GLOWDENA B. FINNIGAN,    )  NO. DV 96-46

11             Plaintiff,    )
                       )
12     -vs-                 )  COMPLAINT
                       )
13   BURLINGTON NORTHERN RAILROAD )
    COMPANY, as Successor in Interest to the )
14   Northern Pacific Railway Company;   )
    SANDERS COUNTY, a quasi municipal )
15   corporation of the State of Montana,   )
                       )
16             Defendants.  )

18     Plaintiff alleges:

19                       I.

20     Plaintiff is the surviving spouse and sole heir of William C. Finnigan, also known as

21   William Coyle Finnigan and William Coyle Finnegan.

22                       II.

23     Plaintiff and her former husband, William C. Finnigan, are the record owners of the

24   following pieces and tracts of land situated in the County of Sanders, State of Montana,

25   described as follows:

hk:Finnigan.1                 1                     439-1

Government Lot Seven (7) and Government Lot Eight (8) in Section 14, Township 26 North, Range 33 West, P.M.M., Sanders County, Montana, less those portions described as follows:

A tract of land lying in Lot 7 of Section Fourteen (14) Township Twenty-six (26) North, Range Thirty-three (33) West, P.M.M., said tract being a strip of land 60 feet wide lying 30 feet on either side of the following described center line:

Beginning at a point of the West line of said Lot 7, 185.51 feet north of the south line of said Section 14; thence
        Easterly along a 6° curve to the left 416 feet, thence
        North 84°45'30" East 341.5 feet, thence
        Easterly along a 10° curve to the left 195 feet; thence
        North 65°15'30" East 52.6 feet; thence
        Easterly along a 15° curve to the right 336.2 feet to the existing road, said point begin 245.2 feet north of and 9.73 feet west of the southeast corner of said Lot 7. Said tract contains 1.85 acres more or less, in Sanders County, Montana; according to Volume 56 of Deeds, Page 234, Sanders County records.

ALSO EXCEPTING

A tract of land in said Government Lot Seven (7) described as follows:

Beginning at the west quarter corner of Section Twenty-four (24), said Township and Range, thence
        North 43°11' West 4,138.93 feet to the true point of beginning; thence
        South 77°04' East 68.87 feet; thence,
        North 68°20' West along a line parallel and concentric with and distant 200 feet southerly, measured at right angles with and radially from the center line of said original main track 68.07 feet to a point which is the beginning of a 2° curve to the left; thence along said parallel line and said 2° curve to the left a distance of 934.9 feet; thence
        South 77°04' East 929.3 feet, more or less, to the true point of beginning; according to Volume 56 of Deeds, Page 235, Sanders County records.

ALSO EXCEPTING

A tract of land in Lot Seven (7), Section Fourteen (14) Township Twenty-six (26) North, Range Thirty-Three (33) West, being described as follows:

Beginning at a point on the west line of said Lot 7
        North 0°22'10" West 578.3 feet from the Southwest corner of said Lot 7, which point is the true point of beginning, thence
        South 89°02'40" East 366.3 feet; thence
        North 77°15'10" West 122.0 feet; thence
        North 89°02'40" West 247.5 feet along the original Northern Pacific Railroad right-of-way to a point on the west line of said Lot 7, thence
        South 0°22'10" East 25.0 feet, more or less, along the west line of said Lot 7, to the true point of beginning, containing in all 0.12 acres more or less; according to Volume 57 of Deeds, Page 506, Sanders County records.

III.

At sometime prior to 1958, the exact dates of which are unknown, the Northern Pacific Railway Company maintained a railroad track across portions of the above-described property, for which the Company had a 400 foot right-of-way being 200 feet on either side of the center line of the railroad tracks. The Northern Pacific Railway Company abandoned the right-of-way across the above-described property. This abandonment occurred at sometime prior to October 1, 1958, which is the date of recordation of a quitclaim deed from the Northern Pacific Railway Company to Sanders County, which deed described the railroad right-of-way which crossed the above-described property. This deed is recorded in Volume 73 of Deeds, page 154, Sanders County records.

IV.

By reason of the Northern Pacific Railway Company's abandonment of its right-of-way, and the provisions of 43 USC § 912, the Plaintiff now owns any portion of the former railroad right-of-way lying within the exterior boundaries of the above-described property. The surface rights incident to the railroad right-of-way reverted to the owner of the underlying fee, with the exception of such parts thereof as may be embraced in a public highway legally established in accordance with the provisions of 43 USC § 912.

V.

The above-named Defendants may have, or claim to have, some right, title, interest, claim or possible claim in, to or upon the above-described property, or to parts or parcels thereof, which are adverse to the Plaintiff's right and title.

WHEREFORE, Plaintiff prays judgment and decree against the Defendants as follows:

1. That the Defendants, and each of them, be required to set forth the nature of their claims, and each of them, if any they have.

2. That all adverse claims of the Defendants, and each of them, be determined by

hk:Flanigan.1

3

439-1

1    a decree of this Court.

2        3.    That the Court declare that the portion of the railroad right-of-way which formerly

3    crossed the above-described property was abandoned by act of the Defendant, Northern Pacific

4    Railway Company, prior to October 1, 1958, and reverted to the owner of the underlying fee,

5    with the exception of such parts thereof as may be embraced in a public highway legally

6    established in accordance with the provisions of 43 USC § 912.

7        4.    That the Plaintiff be declared to be the owner of the above-described property,

8    and possessed of a valid title thereto.

9        5.    That the Plaintiff recover her costs herein accrued against any Defendant who

10    shall appear and defend this action.

11        6.    For such other and further relief as the Court may deem just and equitable.

12    DATED this 1st day of May, 1996.

13                  HUGHES, KELLNER, SULLIVAN & ALKE

14

15                  By _____

16                      John F. Sullivan

                        406 Fuller Avenue

17                        P.O. Box 1166

                        Helena, MT 59624-1166

18                      ATTORNEYS FOR PLAINTIFF

19

20

21

22

23

24

25

# Exhibit 21

1  RUSSELL D. YERGER
   KROCHEL & YERGER
2  2825 Third Avenue North - Suite 607
   Billings, MT 59101
3

                                        FILED June 19, 96
4  ATTORNEYS FOR DEFENDANT
   BURLINGTON NORTHERN RAILROAD COMPANY              COUNTY CLERK of
5
                                        DEPUTY
6

7

8      MONTANA TWENTIETH JUDICIAL DISTRICT COURT, SANDERS COUNTY

9                              * * * * *

10  GLOWDENA B. FINNIGAN,            )        NO. DV 96-46/5
                                     )
11              Plaintiff,           )
                                     )
12      -vs-                         )        DISCLAIMER OF INTEREST
                                     )
13  BURLINGTON NORTHERN RAILROAD     )
    COMPANY, as Successor in Interest to the )
14  Northern Pacific Railway Company; )
    SANDERS COUNTY, a quasi municipal )
15  corporation of the State of Montana, )
                                     )
16              Defendants.          )
                                     )

17

18      COMES NOW, the Burlington Northern Railroad Company, successor in interest to the

19  Northern Pacific Railway Company, acting by and through its duly authorized counsel, and

20  hereby disclaims any right, title, interest, or estate in or to the pieces and tracts of land

21  described in paragraph II of the complaint in this case, and further agrees that the Court may

22  enter an order declaring that the portion of the railroad right-of-way which formerly crossed the

23  property which is the subject matter of this case was abandoned by act of the Northern Pacific

24  Railway Company at some time prior to October 1, 1958.

25  ///

bk:Finnigan.4                          1                          439-1

1    DATED this _____ day of June, 1996.

2                                    KROCHEL & YERGER

3

4                        By  _____
                             Russell D. Yerger
5                             2825 Third Avenue North - Suite 607
                             Billings, MT 59101
6

7                             ATTORNEYS FOR DEFENDANT
                             BURLINGTON NORTHERN RAILROAD COMPANY
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

blk:Finnigan.4                        2                        439-1

# Exhibit 22

### QUITCLAIM DEED

THIS INDENTURE, Made the __1st__ day of __November__, 1996, between GLOWDENA B. FINNIGAN, of Noxon, Montana, PARTY OF THE FIRST PART, and SANDERS COUNTY, MONTANA, a political subdivision of the State of Montana, PARTY OF THE SECOND PART;

WITNESSETH, that the said PARTY OF THE FIRST PART, for and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration in hand paid by said PARTY OF THE SECOND PART, the receipt whereof is hereby acknowledged, does hereby convey, remise, release and forever quitclaim unto the said PARTY OF THE SECOND PART, and to its successors and assigns, an easement for road and right-of-way purposes over and across the following real estate situated in the County of Sanders, and State of Montana, to-wit:

A 60-foot wide strip of land which is 30 feet wide on each side of the centerline of the County road which now exists within the Northern Pacific Railway Company right of way and tracts located in Government Lots 7 and 8 of Section 14, Township 26 North, Range 33 West, M.P.M., including those which were quitclaimed to Sanders County in paragraphs 6 and 7 of an Indenture dated October 1, 1958, which was recorded at Book 73 of Deeds, page 154 of the records of Sanders County, Montana;

Excepting and reserving an easement in favor of the PARTY OF THE FIRST PART and her successors the right to place, maintain, operate, repair, replace, and relocate utilities over and under the easement area, including, but not limited to water, sewer, telephone, power, and television, provided that such utilities must be placed, maintained, operated, repaired, replaced, and relocated in such a manner that said utilities do not incommode or endanger the public in the use of the easement area for road and right-of-way purposes.

TO HAVE AND TO HOLD, all and singular the said easement with the appurtenances thereto belonging, unto the said PARTY OF THE SECOND PART, and to its successors and assigns forever.

IN WITNESS WHEREOF, the said PARTY OF THE FIRST PART has hereunto set her hand and seal the day and year first hereinabove written.

SWORN TO AND SUBSCRIBED BEFORE ME
THIS __1__ DAY OF __November__ A.D. 19 96

_Linda Weissenborn_
NOTARY PUBLIC STATE OF MISSOURI
MY COMMISSION EXPIRES    9-29-98
COUNTY OF __Stoddard__

Linda Weissenborn

_Glowdena B. Finnigan_
Glowdena B. Finnigan

hk:Finnigan.B

1

439-1

Missouri
STATE OF ~~MONTANA~~ )
Stoddard                     : ss.
County of ~~Sanders~~ )

    On this 19 day of November                     , 1996, before me, the Missouri
undersigned, a Notary Public in and for the State of ~~Montana~~, personally appeared
Glowdena B. Finnigan, known to me to be the person whose name is subscribed to the
within and foregoing QUITCLAIM DEED, and acknowledged to me that she executed the
same.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal
the day and year in this certificate first above written.

             (SEAL)

Notary Public for the State of ~~Montana.~~ Missouri
Residing at Advance, MO - Stoddard County
My Commission expires: 9-29-98
Linda Weissenborn

ACCEPTED:

BOARD OF COUNTY COMMISSIONERS,
Sanders County, Montana

Chairperson - Cherie Hooten

Member - Steve Wheat

Member - Carol Brooker

DATE: 11 / 12 / 96

Attest:

Tillie Wollaston, Clerk and Recorder
Sanders County, Montana

DATE: 11 / 12 / 96

hk:Finnigan.B

2

439-1

# Exhibit 23

## QUITCLAIM DEED

THIS INDENTURE, Made the 12th day of November, 1996, between **SANDERS COUNTY, MONTANA**, a political subdivision of the State of Montana, **PARTY OF THE FIRST PART**, and **GLOWDENA B. FINNIGAN**, of Noxon, Montana, **PARTY OF THE SECOND PART;**

WITNESSETH, that the said **PARTY OF THE FIRST PART**, for and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration in hand paid by said **PARTY OF THE SECOND PART**, the receipt whereof is hereby acknowledged, does hereby convey, remise, release and forever quitclaim unto the said **PARTY OF THE SECOND PART**, and to her heirs and assigns, the following real estate situated in the County of Sanders, and State of Montana, to-wit:

The Northern Pacific Railway Company right of way and tracts located in Government Lots 7 and 8 in Section 14, Township 26 North, Range 33 West, M.P.M., including those which were conveyed to Sanders County in paragraphs 6 and 7 of an Indenture dated October 1, 1958, which was recorded at Book 73 of Deeds, page 154 of the records of Sanders County, Montana, said property being specifically described as follows:

1.    That portion of Government Lots Seven (7) and Eight (8) in Section Fourteen (14), Township Twenty-six (26) North, Range Thirty-three (33) West, Montana Principal Meridian, lying northeasterly of a line parallel and concentric with and distant two hundred (200) feet southwesterly, measured at right angles and radially from the center line of the original main track referred to in paragraph 6 of the Indenture recorded at Book 73 of Deeds, page 154 of the records of Sanders County, Montana, and lying southwesterly of a line parallel and concentric with and distant two hundred (200) feet northeasterly, measured at right angles and radially from the center line of the relocated main track referred to in paragraph 6 of the Indenture recorded at Book 73 of Deeds, page 154 of the records of Sanders County, Montana.

2.    A tract of land in Government Lot Seven (7), Section Fourteen (14), Township Twenty-six (26) North, Range Thirty-three (33) West, Montana Principal Meridian, being described as follows:

Beginning at the west quarter corner of Section Twenty-four (24), said Township and Range, thence
     North 43°11' West 4,138.93 feet to the true point of beginning; thence
     South 77°04' East 68.87 feet; thence,
     North 68°20' West along a line parallel and concentric with and distant 200 feet southerly, measured at right angles with and radially from the center line of said original main track 68.07 feet to a point which is the beginning of a 2° curve to the left; thence along said parallel line and said 2° curve to the left a distance of 934.9 feet; thence
     South 77°04' East 929.3 feet, more or less, to the true point of beginning; according to Volume 56 of Deeds, Page 235, Sanders County records.

hk:Finnigan A                                   1                                   439-1

3.      A tract of land in Government Lot Seven (7), Section Fourteen (14), Township Twenty-six (26) North, Range Thirty-three (33) west, Montana Principal Meridian, being described as follows:

Beginning at a point on the west line of said Lot 7
North 0°22'10" West 578.3 feet from the Southwest corner of said Lot 7, which point is the true point of beginning, thence

South 89°02'40" East 366.3 feet; thence
North 77°15'10" West 122.0 feet; thence
North 89°02'40" West 247.5 feet along the original Northern Pacific Railroad right-of-way to a point on the west line of said Lot 7, thence

South 0°22'10" East 25.0 feet, more or less, along the west line of said Lot 7, to the true point of beginning, containing in all 0.12 acres more or less; according to Volume 57 of Deeds, Page 506, Sanders County records.

Excepting and reserving in favor of the **PARTY OF THE FIRST PART** an easement for road and right-of-way purposes over and across the above-described property, with this easement being a 60-foot wide strip of land which is 30 feet wide on each side of the centerline of the County road which now exists within the above-described property, and with this easement being subject to the right of the **PARTY OF THE SECOND PART** and her successors to place, maintain, operate, repair, replace, and relocate utilities over and under the easement area, including, but not limited to water, sewer, telephone, power and television, provided that such utilities must be placed, maintained, operated, repaired, replaced, and relocated in such a manner that said utilities do not incommode or endanger the public in the use of the easement area for road and right-of-way purposes.

TO HAVE AND TO HOLD, all and singular the said premises with the appurtenances thereto belonging, unto the said **PARTY OF THE SECOND PART,** and to her heirs and assigns forever.

BOARD OF COUNTY COMMISSIONERS, SANDERS COUNTY, MONTANA

By _____
Chairperson - Cherie Hooten

By _____
Member - Steve Wheat

By _____
Member - Carol Brooker

bk:Finnigan.A                                2                                439-1

# Exhibit 24

008325

FILED Dec 10 19 96

Evelyn Cox
COUNTY CLERK OF COURT

By Teresa Spangler
DEPUTY

MONTANA TWENTIETH JUDICIAL DISTRICT COURT, SANDERS COUNTY

* * * * *

GLOWDENA B. FINNIGAN,　　　　　　　)　　　　　　NO. DV 96-46
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　-vs-　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)　　　　　　JUDGMENT
BURLINGTON NORTHERN RAILROAD　)
COMPANY, as Successor in Interest to the　)
Northern Pacific Railway Company;　　　)
SANDERS COUNTY, a quasi municipal　)
corporation of the State of Montana,　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　　　)

Pursuant to the Stipulation for Entry of Judgment filed herein,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

　　　1.　　　Plaintiff is the surviving spouse and sole heir of William C. Finnigan, also known as William Coyle Finnigan and William Coyle Finnegan.

　　　2.　　　Plaintiff and her former husband, William C. Finnigan, are the record owners of the pieces and tracts of land situated in the County of Sanders, State of Montana, described as follows:

Government Lot Seven (7) and Government Lot Eight (8) in Section 14, Township 26 North, Range 33 West, P.M.M., Sanders County, Montana, less those portions described as follows:

bk:Finnigan.6

1

439-1

003395

A tract of land lying in Lot 7 of Section Fourteen (14) Township Twenty-six (26) North, Range Thirty-three (33) West, P.M.M., said tract being a strip of land 60 feet wide lying 30 feet on either side of the following described center line:

Beginning at a point of the West line of said Lot 7, 185.51 feet north of the south line of said Section 14; thence

    Easterly along a 6° curve to the left 416 feet, thence
    North 84°45'30" East 341.5 feet, thence
    Easterly along a 10° curve to the left 195 feet; thence
    North 65°15'30" East 52.6 feet; thence
    Easterly along a 15° curve to the right 336.2 feet to the existing road, said point begin 245.2 feet north of and 9.73 feet west of the southeast corner of said Lot 7. Said tract contains 1.85 acres more or less, in Sanders County, Montana; according to Volume 56 of Deeds, Page 234, Sanders County records.

ALSO EXCEPTING

A tract of land in said Government Lot Seven (7) described as follows:

Beginning at the west quarter corner of Section Twenty-four (24), said Township and Range, thence

    North 43°11' West 4,138.93 feet to the true point of beginning; thence
    South 77°04' East 68.87 feet; thence,
    North 68°20' West along a line parallel and concentric with and distant 200 feet southerly, measured at right angles with and radially from the center line of said original main track 68.07 feet to a point which is the beginning of a 2° curve to the left; thence along said parallel line and said 2° curve to the left a distance of 934.9 feet; thence
    South 77°04' East 929.3 feet, more or less, to the true point of beginning; according to Volume 56 of Deeds, Page 235, Sanders County records.

ALSO EXCEPTING

A tract of land in Lot Seven (7), Section Fourteen (14) Township Twenty-six (26) North, Range Thirty-Three (33) West, being described as follows:

Beginning at a point on the west line of said Lot 7

    North 0°22'10" West 578.3 feet from the Southwest corner of said Lot 7, which point is the true point of beginning, thence
    South 89°02'40" East 366.3 feet; thence
    North 77°15'10" West 122.0 feet; thence
    North 89°02'40" West 247.5 feet along the original Northern Pacific Railroad right-of-way to a point on the west line of said Lot 7, thence
    South 0°22'10" East 25.0 feet, more or less, along the west line of said Lot 7, to the true point of beginning, containing in all 0.12 acres more or less; according to Volume 57 of Deeds, Page 506, Sanders County records.

3.    At sometime prior to 1958, the exact dates of which are unknown, the Northern

hk:Finnigun.6

2

439-1

008325

1  Pacific Railway Company maintained a railroad track across portions of the above-described

2  property, for which the Company had a 400 foot right-of-way being 200 feet on either side of

3  the center line of the railroad tracks. The Northern Pacific Railway Company abandoned the

4  right-of-way across the above-described property. This abandonment occurred at sometime

5  prior to October 1, 1958, which is the date of recordation of a quitclaim deed from the Northern

6  Pacific Railway Company to Sanders County, which deed described the railroad right-of-way

7  which crossed the above-described property. This deed is recorded in Volume 73 of Deeds,

8  page 154, Sanders County records.

9       4.     The Burlington Northern Railroad Company, successor in interest to the Northern

10  Pacific Railway Company, has filed a Disclaimer of Interest in this action, by which it disclaimed

11  any right, title, interest or estate in or to the pieces and tracts of land described above, and

12  further agreed that the Court may enter an order declaring that the portion of the railroad

13  right-of-way which formerly crossed the property which is the subject matter of this case was

14  abandoned by act of the Northern Pacific Railway Company at sometime prior to October 1,

15  1958.

16       5.     As a means of settling the claims of the parties, the parties have executed the

17  deeds attached to the Stipulation for Entry of Judgment, the originals of which shall be recorded

18  with the Sanders County Clerk and Recorder.

19       6.     In consideration of the easement granted to Sanders County by means of the

20  attached deeds, Sanders County has agreed that it shall take no further action to establish any

21  public roads, highways or other facilities under the provisions of 42 USC § 912.

22       7.     The parties shall pay their respective costs and attorney fees.

23       DATED this _10_ day of ___Dec___, 1996.

24

25                                          _E. 3 M'Neil_
                                            **DISTRICT JUDGE**

# Exhibit 25

Timothy M. Bechtold
Bechtold Law Firm, PLLC
317 East Spruce Street
P.O. Box 7051
Missoula, MT 59807-7051
406-721-1435
406-830-3085 (fax)
tim@bechtoldlaw.net

Attorneys for Estate of Glowdena B. Finnigan

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | | |
|---|---|---|
| **ESTATE OF GLOWDENA B. FINNIGAN,** | ) ) ) | **CV 18-109-M-DLC-JCL** |
| Plaintiff, | ) ) | **DECLARATION OF CARMON MARIE GROFF** |
| vs. | ) ) ) | |
| **UNITED STATES OF AMERICA,** | ) ) ) | |
| Defendant | ) | |

Pursuant to 28 USC §1746, I, Carmon Marie Groff, declare as follows:

1.       I am the daughter of Glowdena B. Finnigan and am one of the co-personal representatives of the Estate of Glowdena B. Finnigan, the Plaintiff in this case.  I authorized the Estate to bring this action on behalf of the four heirs of the Estate, all of whom are individuals who are lineal descendants of my mother. Neither the Estate nor any of the four individual heirs has now or has ever had a net worth in excess of $2,000,000.

2.     I lived on the Finnigan property as I grew up, from 1952-1966. Since I have retired, my husband and I have lived on the property from 2013 until the present.

3.     As a matter of personal knowledge and throughout my entire life, I have been familiar with the Finnigan Property since the time in the 1950s when the railroad abandoned the right of way that traverses the Finnigan Property.  My knowledge includes how the Finnigan Property has been used and any claims or lack of claims to ownership of the Finnigan Property by other entities.

4.     Until 2017, when the Estate first asked the United States to disclaim any interest in the Finnigan Property, as part of the administration of the Estate of Glowdena B. Finnigan, the United States had never occupied, used, or asserted any regulatory or administrative authority as to the Finnigan Property.  In addition, no effort has ever been made by the United States or any other entity to establish a trail, as contemplated by the 1988 National Trails System Improvement Act, commonly known as the "Rails to Trails" law.

5.     As a practical matter, the establishment of a "Rails to Trails" trail over the Finnigan Property is not necessary or practical for the following reasons:  (1) much of the former railroad right of way across the Finnigan Property is under water due to construction of the Cabinet Gorge Dam; (2) the remaining railroad right of way that traverses the Finnigan Property is not of sufficient length for a trail that would be of any use or benefit; and (3) there is already a 60 foot easement

**Page 2        Declaration of Carmon Marie Groff**

for a well-maintained, year-round County road and part of that easement not
occupied by the road could be used for construction of a trail, if that should ever be
needed.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this __18th__ day of January, 2019.


Carmon Marie Groff